# United States Court of Appeals
## For the First Circuit

---

No. 15-1900

UNITED STATES OF AMERICA,
Appellant,

v.

ÁNGEL GABRIEL FERNÁNDEZ-JORGE,
Defendant, Appellee.

---

No. 15-1975

UNITED STATES OF AMERICA,
Appellee,

v.

BRIAN PÉREZ-TORRES,
Defendant, Appellant.

---

No. 15-2001

UNITED STATES OF AMERICA,
Appellee,

v.

JOSÉ A. DE LA CRUZ-VÁZQUEZ,
Defendant, Appellant.

---

No. 15-2104

UNITED STATES OF AMERICA,
Appellee,

v.

EDWIN OTERO-DÍAZ,
Defendant, Appellant.

No. 15-2168

                    UNITED STATES OF AMERICA,
                             Appellee,

                                v.

                      ISAÍAS MENDOZA-ORTEGA,
                      Defendant, Appellant.

No. 15-2244

                    UNITED STATES OF AMERICA,
                             Appellee,

                                v.

                      EDWIN OTERO-MÁRQUEZ,
                      Defendant, Appellant.


              APPEALS FROM THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF PUERTO RICO

          [Hon. Daniel R. Domínguez, U.S. District Judge]


                              Before

                 Torruella, Lipez, and Barron,
                       Circuit Judges.


          Víctor P. Miranda-Corrada, for appellant Fernández-Jorge.
          Ramón M. González, on brief for appellant Pérez-Torres.
          Humberto Guzmán-Rodríguez and Guzmán & Rodríguez-López Law
     Office, on brief for appellant De la Cruz-Vázquez.
          Edgar L. Sánchez-Mercado, on brief for appellant Otero-Díaz.
          Juan A. Albino-González, with whom Albino & Assoc. Law Office,
     PC was on brief, for appellant Mendoza-Ortega.
          Lauren E.S. Rosen, Assistant Federal Public Defender, with
     whom Patricia A. Garrity, Research and Writing Specialist, Eric A.
     Vos, Federal Public Defender, and Vivianne M. Marrero-Torres,
     Assistant Federal Public Defender, Supervisor, Appeals Section,
     were on brief, for appellant Otero-Márquez.

     Mainon A. Schwartz, Assistant United States Attorney, with
whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and
Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief,
Appellate Division, were on brief, for appellee.

---

June 26, 2018

---

**TORRUELLA**, **Circuit Judge**. After a jury trial, Ángel Gabriel Fernández-Jorge, Brian Pérez-Torres, José A. De La Cruz-Vázquez, Edwin Otero-Díaz, Isaías Mendoza-Ortega, Edwin Otero-Márquez, and Rafael Martínez-Trinidad (collectively, the "Defendants") were found guilty of possessing firearms in a school zone.[1] The jury also found Mendoza-Ortega and Otero-Márquez guilty of possessing firearms as convicted felons. All of the Defendants then brought motions for acquittal, but the district court granted only that of Fernández-Jorge. Now, the government appeals the district court's grant of Fernández-Jorge's motion, while Pérez-Torres, De La Cruz-Vázquez, Otero-Díaz, Mendoza-Ortega, and Otero-Márquez (collectively, the "Defendant-Appellants") appeal the district court's denial of their motions for acquittal. We also consider whether the district court's jury instructions concerning aiding and abetting liability were erroneous.

After considering all of this, we hold the following: (1) sufficient evidence supported the Defendant-Appellants' convictions for possession of a firearm in a school zone (Count Three); (2) sufficient evidence did not support Fernández-Jorge's conviction for possession of a firearm in a school zone; (3) the district court's erroneous jury instructions on aiding and

---

[1] Martínez-Trinidad elected not to pursue an appeal following his conviction.

abetting liability require us to vacate the Defendant-Appellants' convictions for Count Three; and (4) sufficient evidence did not support the convictions of Mendoza-Ortega and Otero-Márquez for possession of a firearm as convicted felons, which requires us to reverse their convictions for Count One.

# I.  Background

We begin with a brief summary of the facts and procedural events leading up to this appeal, into which we shall delve with greater detail in taking up the various issues the parties have raised.  Because this appeal pertains, in part, to the Defendants' motions for acquittal before the district court, we recount the facts here "in the light most favorable to the government."  See United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018).

**A. The shootout**

A shootout took place in front of the Jardines de Oriente public housing project, in Humacao, Puerto Rico, during the late morning of February 16, 2012.  Officers from the Puerto Rico Police Department arrived at Jardines de Oriente shortly after the gunfire stopped.  They observed several people in dark clothing abscond -- jumping the housing project's perimeter fence and entering the large concrete tunnel behind the fence into which the Mabú creek drains.  That tunnel runs between the Jardines de Oriente and the Rufino Vigo public elementary school (the "School").  It ends at

the Doctor Palou public housing project. Officers positioned themselves outside of the tunnel's entrance. Two men attempted to escape from the top of the tunnel through a manhole. After police fired a warning shot, one of these men, De la Cruz-Vázquez, dove into some nearby bushes and was promptly arrested, searched, and found to be carrying ammunition. The other man retreated back down the manhole in response to the warning shot.

Meanwhile, the officers waiting at the entrance to the tunnel heard voices and the sound of gunfire from inside the tunnel. The officers ordered anyone inside the tunnel to exit with their hands up. The six remaining Defendants -- all shirtless and unarmed -- emerged from the tunnel and were arrested. Officers then searched the tunnel and recovered seven firearms, ammunition, and various articles of clothing. Ballistics analyses would later link four of these weapons to the shootout at Jardines de Oriente.

Five of the Defendants stated that they lived at the Doctor Palou public housing project, located at the end of the tunnel opposite where the shootout occurred. Mendoza-Ortega lived elsewhere in Humacao. Fernández-Jorge was not from Humacao, but rather from San Juan.

**B. The trials**

In February 2012, a grand jury returned an indictment against the seven individuals arrested in connection with the

shootout. Count One of the indictment charged Otero-Márquez and Mendoza-Ortega with possessing firearms as convicted felons, in the principal and aiding and abetting forms. See 18 U.S.C. §§ 2, 922(g). Count Three accused all seven Defendants of possessing firearms within a school zone, also in the principal and aiding and abetting forms. See 18 U.S.C. §§ 2, 922(q)(2)(A).[2]

All of the Defendants proceeded to trial, and the jury found all of them guilty on all counts. However, it then came to light that, through unsanctioned research, one or more members of the jury had discovered that two people died during the shootout.[3] This forced the district court to declare a mistrial.

A second trial ensued, and the jury again found all Defendants guilty on Count Three, and found Mendoza-Ortega and Otero-Márquez guilty on Count One as well. The jury filled out general verdict forms, which did not distinguish between the principal and aiding and abetting forms of the charged offenses. The Defendants proceeded to file motions for acquittal. See Fed. R. Crim. P. 29. In an omnibus order, the district court denied those motions in their entirety, except as to Fernández-

---

[2] The district court granted the Defendants' motion for acquittal on Count Two of the indictment, possession of a stolen firearm, and the government did not appeal that decision.

[3] Evidence of these deaths had been excluded from trial.

Jorge. According to the district court, the government had not brought forth sufficient evidence that Fernández-Jorge -- who, unlike his codefendants, did not live in Humacao -- knew or should have known that he was in a school zone. The court sentenced each of the remaining Defendants to 60 months' imprisonment for Count Three. It also sentenced both Mendoza-Ortega and Otero-Márquez to an additional 120 months' imprisonment for Count One, to be served consecutively with their sentences for Count Three.

Now, the government appeals Fernández-Jorge's acquittal and the Defendant-Appellants appeal their convictions, challenging both the sufficiency of the evidence and the district court's jury instructions. We first consider whether sufficient evidence supported all of the Defendants' convictions on Count Three, and the convictions of Mendoza-Ortega and Otero-Márquez on Count One. We then address whether the district court correctly instructed the jury on aiding and abetting liability.

## II. The motions for acquittal

We review a district court's ruling on a Rule 29 motion de novo, viewing the evidence in the light most favorable to the jury's guilty verdict. United States v. Santos-Soto, 799 F.3d 49, 56-57 (1st Cir. 2015). The "verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime

beyond a reasonable doubt." United States v. Rodríguez-Vélez, 597 F.3d 32, 39 (1st Cir. 2010) (emphasis in original).

Because Counts One and Three charged the Defendants in the principal and aiding and abetting forms, we also find it useful to review the essentials of aiding and abetting liability. 18 U.S.C. § 2 provides that anyone who aids or abets a crime against the United States "is punishable as a principal."[4] One "is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." United States v. Encarnación-Ruiz, 787 F.3d 581, 587 (1st Cir. 2015) (quoting Rosemond v. United States, 134 S. Ct. 1240, 1245 (2014)). To be guilty of aiding and abetting a crime, a defendant need not have actually assisted the principal in committing each element of the crime. Id. But, the defendant does need to have "intend[ed] to facilitate 'the specific and entire crime charged.'" Id. (quoting Rosemond, 134 S. Ct. at 1248). As a

---

[4] The overwhelmingly preferred nomenclature for this form of criminal liability -- which the indictment also used -- is the conjunctive "aiding and abetting." Yet, 18 U.S.C. § 2 applies to anyone who "aids, abets, counsels, commands, induces or procures [the underlying offense's] commission." Id. (emphasis added). This distinction seems to lack significance, though, as it is difficult to imagine a case in which a defendant has "aided" the commission of an offense without also having "abetted" it, or vice versa.

result, the defendant must have had "advance knowledge" of the crime he or she facilitated to be guilty of aiding and abetting it.  Id. at 588 (quoting Rosemond, 134 S. Ct. at 1249); see also United States v. Ford, 821 F.3d 63, 69 (1st Cir. 2016).  Finally, "[p]roving beyond a reasonable doubt that a specific person is the principal is not an element of the crime of aiding and abetting." United States v. Campa, 679 F.2d 1006, 1013 (1st Cir. 1982).

**A. The Defendant-Appellants' motions for acquittal on Count Three**

In attacking the district court's denial of their Rule 29 motions as to the possession of a firearm in a school zone count, the Defendant-Appellants advance three categories of arguments.  First, all of the Defendant-Appellants argue that the government did not introduce sufficient evidence that they possessed the firearms recovered from the tunnel.  Second, De la Cruz-Vázquez and Otero-Díaz assert that the government failed to sufficiently establish that they were, in fact, within a school zone.  Finally, Pérez-Torres, De la Cruz-Vázquez, Mendoza-Ortega, and Otero-Díaz argue that sufficient evidence did not support the conclusion that they knew or should have known that they were in a school zone.

**1. Possession of firearms**

We begin by considering whether any rational fact-finder could have concluded beyond a reasonable doubt that the Defendant-

Appellants possessed firearms or aided and abetted each other in doing so with advance knowledge of this element.[5] See Rosemond, 134 S. Ct. at 1249; Rodríguez-Vélez, 597 at 39.

"'Knowing possession of a firearm' may be proven through either actual or constructive possession." United States v. Guzmán-Montañez, 756 F.3d 1, 8 (1st Cir. 2014). Proving constructive possession, in turn, requires proving that the defendant had "the power and intention of exercising dominion and control over the firearm." Id. (citing United States v. DeCologero, 530 F.3d 36, 67 (1st Cir. 2008)). Constructive possession may be joint. DeCologero, 530 F.3d at 67. Additionally, it is possible to prove constructive possession by relying entirely upon circumstantial evidence. Guzmán-Montañez, 756 at 8 (citing United States v. Wight, 968 F.2d 1393, 1398 (1st Cir. 1992)). However, "mere presence with or proximity to weapons or association with another who possesses a weapon" is insufficient to circumstantially establish constructive possession. United States v. Rodríguez-Lozada, 558 F.3d 29, 40 (1st Cir. 2009). Rather, it is necessary to show "some action, some word, or some conduct that

---

[5] None of the Defendant-Appellants have challenged the district court's holding that, for Rule 29 purposes, the government succeeded in establishing that the firearms in question had traveled through interstate commerce, an element of Counts One and Three. See 18 U.S.C. § 922(g), (q)(2)(A).

links the individual to the contraband and indicates that he had some stake in it, some power over it." United States v. McLean, 409 F.3d 492, 501 (1st Cir. 2005) (quoting In re Sealed Case, 105 F.3d 1460, 1463 (D.C. Cir. 1997)). For example, valid circumstantial evidence of constructive possession includes evidence of an individual's "control over the area where the contraband is found." Id.

Though no witnesses testified to having seen any of the Defendant-Appellants possessing a weapon, the government contends that it introduced ample circumstantial evidence of possession. We now review that evidence.

First, Officer Ángel Fontánez testified that he was on motorcycle patrol near Jardines de Oriente on the morning of February 16, 2012, when he heard the sound of gunfire emanating from the housing project. Fontánez took cover behind the supporting column of a nearby bridge, and once the gunfire subsided, he approached Jardines de Oriente on his motorcycle. Though some buildings partially obstructed his view, he saw seven or eight individuals -- several of them wearing dark clothing -- running towards a fence at the back of Jardines de Oriente. He said that he then observed three or four people scale that fence and head toward the entrance of a tunnel located on the other side.

Fontánez hurried to the tunnel's entrance, where several other officers had also gathered.

Fontánez then testified that, while positioned outside the entrance, he heard voices and the sound of gunfire from within the tunnel. According to Fontánez, two people then emerged from a manhole atop the tunnel and attempted to flee. When those two did not heed Fontánez's order to freeze, he fired a warning shot. In response, one of the two individuals retreated back down the manhole, while the other dove into some nearby bushes. The bushes, however, provided ineffective cover, and officers arrested this individual (later identified as De la Cruz-Vázquez) -- whom Fontánez described as wearing a black jacket and gloves -- and discovered a magazine containing around 30 bullets in his pocket. Officer Víctor Cruz-Sánchez corroborated Officer Fontánez's testimony about arresting De la Cruz-Vázquez and finding ammunition on him after he surfaced from the manhole.[6]

Agent José López-Ortiz testified that he was on patrol when he received a radio call about the events transpiring at Jardines de Oriente. He approached the housing project in his

---

[6] Cruz-Sánchez himself did not testify during the second trial. Rather, the district judge's two law clerks read Cruz-Sánchez's testimony from the first trial into the record. One clerk played the part of Cruz-Sánchez, and the other the various attorneys who questioned him during that proceeding.

vehicle and waited underneath the same bridge as Fontánez, along with other officers, until the sound of gunfire coming from Jardines de Oriente relented. López-Ortiz testified that, as he and Fontánez approached Jardines de Oriente together, he saw three people dressed in black jump over a fence and into a ditch on the other side. From there, López-Ortiz explained, those individuals ran into a tunnel, at which point he lost sight of them.

The jury also heard testimony from Puerto Rico Police Agent Abdel Morales-De León, another of the officers who responded to the shootout at Jardines de Oriente. He too testified about hearing male voices and gunfire from within the tunnel as he approached its entrance alongside other officers. Six shirtless males then emerged from the tunnel and were promptly detained.[7] Morales-De León recovered a .233-caliber bullet -- which he described as appearing recently discharged -- from the ground where

---

[7]  We note that the record is not entirely clear as to whether De la Cruz-Vázquez and his companion attempted to escape from the manhole before or after the remaining six Defendants were arrested after emerging from the tunnel's entrance. This is largely because no one officer testified about both events. The parties and the district court, however, all seem to have treated the "manhole escape" as having occurred first. Particularly because nobody has made arguments concerning the possibility that anyone remained in the tunnel after the seven Defendants were detained, we do not see any reason to depart from this assumption. Additionally, insofar as this sequence of events is more favorable to the jury's verdict, the standard for reviewing Rule 29 motions would also require us to construe the facts in this manner.

these individuals were arrested. He then entered the tunnel with a group of officers, using a small flashlight to light their way. Morales-De León explained that their search of the tunnel turned up seven firearms, a fanny pack containing several loaded magazines, and various articles of dark clothing. He added that the officers noticed fresh mud prints on the steps leading up to a manhole connecting the tunnel to the surface, and that the manhole cover had been removed.

Officer Daniel Rosas-Rivera also provided an account of his role in responding to the shootout and subsequent events. He described hearing gunfire from within the tunnel as he approached it alongside other officers. He then told the jury that he observed six shirtless men emerge from the tunnel with their hands up, exclaiming "don't shoot us." Rosas-Rivera was also among the officers who entered the tunnel with a flashlight immediately after the Defendants' arrest. He testified that their sweep of the tunnel revealed that it was possible to exit the tunnel via a manhole, and that they found that manhole open, its cover having been moved aside. Rosas-Rivera also explained that the officers' search of the tunnel yielded a bullet, loaded firearms, and magazines.

Gualberto Rivas-Delgado testified about the investigation of the tunnel that he undertook as a member of the

Puerto Rico Police's Technical Services Division.  He arrived on-scene at around 4:00 p.m. on the day of the shootout, after Rosas-Rivera and Morales-De León had completed the initial sweep of the tunnel about which they testified.  Rivas-Delgado found more ammunition inside of the tunnel -- some of it submerged in puddles, and some sealed in a plastic bag -- as well as additional articles of clothing, most of them dark in color.

Finally, the jury heard testimony from Edward Pérez-Benítez, a firearms examiner and tool marks expert from Puerto Rico's Institute of Forensic Sciences.  He explained that he had examined the weapons recovered from the tunnel and bullets recovered from the site of the shootout at Jardines de Oriente. His investigation led him to conclude that four of the guns found in the tunnel had been used in the shootout.

In synthesis, the jury heard the following: (1) a shooting had occurred in the Jardines de Oriente on the morning of February 16, 2012; (2) seven or eight individuals in dark clothing were seen fleeing the scene of the shooting; (3) officers saw three or four of these men enter a tunnel; (4) De la Cruz-Vázquez was arrested, shirtless, after trying to escape from a manhole atop the tunnel, and was found to be carrying a loaded magazine; (5) officers standing at the entrance to the tunnel heard weapons discharge inside the tunnel; (6) the remaining six Defendants then

emerged, shirtless, from the tunnel and were arrested; (7) officers recovered seven firearms, ammunition, and various articles of dark clothing from within the tunnel; and (8) a ballistics expert linked four of those firearms to the shootout at Jardines de Oriente.

All of this is sufficient evidence for a rational fact-finder to conclude that at least one of the Defendant-Appellants possessed a firearm, while the remainder aided and abetted him. See Campa, 679 F.2d at 1013 (identity of principal not an element of aiding and abetting). And that is sufficient to sustain the Defendant-Appellants' Count Three convictions. The first component of this conclusion, that at least one of the seven Defendants possessed a firearm, is particularly unavoidable given that four of the weapons found in the tunnel had been fired during the shootout. Further, keeping in mind that advance knowledge of each element of the underlying offense is an element of aiding and abetting, see Rosemond, 134 S. Ct. at 1249, we agree with the government that the evidence here does tend to suggest that the Defendant-Appellants had advance knowledge of, and participated in some form in, the shootout. Thus, we think that the evidence would allow a rational fact-finder to conclude that any Defendant-Appellants who were not principals (because they did not possess firearms) nonetheless facilitated the principal or principals'

possession, with advance knowledge of this element.  We now turn to the remaining elements of Count Three.

**2. Actual presence in a school zone**

We now take up the assertion of De La Cruz-Vázquez and Otero-Díaz that the government failed to establish that they were, in fact, in a school zone when they allegedly possessed a firearm. A "school zone" is the area within 1,000 feet from the grounds of any school.  United States v. Nieves-Castaño, 480 F.3d 597, 603 (1st Cir. 2007) (quoting 18 U.S.C. § 921(a)(25)).  We note that the proper inquiry here -- given the possibility for aiding and abetting liability -- is whether any of the Defendants found himself in a school zone while possessing a firearm.

At trial, government witness and Puerto Rico Police Officer José Hiraldo-Benítez explained his conclusion, which he reached by employing distance-measuring laser equipment, that 710 feet separated the School's perimeter fence and the point in the tunnel where the weapons were found.  He likewise explained that 804 and 837 feet separated the School's fence from two points where spent shell casings from the shootout had been found.[8]  Finally, according to Hiraldo-Benítez, the margin of error for these measurements was less than one inch.

---

[8]  Hiraldo-Benítez's measurements relied on other officers' representations of where the weapons in the tunnel.

We find this to be sufficient evidence to support the conclusion that one or more of the Defendants possessed firearms within a school zone. De La Cruz-Vázquez stresses that Hiraldo-Benítez may have arrived at his figure of 710 feet by measuring from a point atop the tunnel that did not necessarily lay precisely over the point in the tunnel where the weapons were found. This theoretical possibility does not, however, mean that no reasonable fact-finder could have concluded that any of the Defendant-Appellants possessed firearms anywhere within 1,000 feet of the School.

First, a reasonable fact-finder could well have concluded that Hiraldo-Benítez did measure from the correct point atop the tunnel. This is particularly so given the paucity of reasons that De la Cruz-Vázquez offers to believe that Hiraldo-Benítez measured from an incorrect point. Second, even if Hiraldo-Benítez did measure from the wrong point, that still would not foreclose the reasonable conclusion that the Defendant-Appellants possessed firearms in a school zone. Given that at least four of the guns traveled from the site of the shootout to the tunnel, the precise location in the tunnel where they were found is of lesser importance. We further note that De la Cruz-Vázquez does not dispute that shell casings were found within the school zone. And this strongly suggests that the shootout involved

guns being fired, and therefore possessed, within a school zone. De la Cruz-Vázquez and Otero-Díaz, therefore, come up quite short in attempting to convince us that no reasonable factfinder could have concluded that any of the Defendants possessed a firearm within 1,000 feet of the School. Having resolved that point, we now take up the final disputed element of Count Three.

**3. Knowing presence in a school zone**

We next consider whether each of the Defendant-Appellants knew or should have known that they were in a school zone while they were possessing a firearm or, alternatively, that each of them was aiding and abetting such possession of a firearm in a school zone with the requisite advance knowledge. See 18 U.S.C. §§ 2, 922(q)(2)(A). Circumstantial evidence may serve as the solitary proof of one's culpable knowledge. United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). However, in Guzmán-Montañez, we overturned the defendant's conviction under § 922(q)(2)(A) when the government, in attempting to establish the defendant's knowledge that he was in a school zone, relied solely upon the school's proximity to the location where the defendant was found armed. 756 F.3d at 11-12. In concluding that a rational factfinder could not have made this "giant leap of faith," we stressed in particular that the defendant was not a resident of that area. Id. at 12. This contrasts with our holding in Nieves-

-21-

Castaño. There, in reaching the opposite conclusion about the defendant's knowledge, we emphasized that "three minor children lived with the defendant, and it would be easy for a jury to conclude that she knew there were two schools nearby, within or just outside her housing project and less than 1000 feet away, and that she regularly passed by those schools." 480 F.3d at 604. Here, the evidence of the Defendant-Appellants' knowledge of the school zone seems to fall between these two poles.

The government makes a number of arguments in support of the district court's determination that sufficient evidence established that the Defendant-Appellants either knew or should have known that they were in a school zone. First -- pointing largely to the same evidence we considered in addressing their actual presence in a school zone -- the government stresses that the Defendant-Appellants found themselves in close proximity to the School at the relevant times. Specifically, the government highlights that the School's basketball court was approximately 50 feet from the fence that the Defendant-Appellants scaled en route to the tunnel. The government adds that the basketball court's roof was also visible from Jardines de Oriente. But, on its own -- especially given that nothing about the roof of this basketball court suggested that it was part of a school -- this evidence would not suffice. See Guzmán-Montañez, 756 F.3d at 11-12. However,

this is not the extent of the evidence that the government introduced.

The government also avers that it would be reasonable for the jury to have inferred that the Defendant-Appellants put some amount of forethought into the shootout and their subsequent escape. The swiftness of the Defendant-Appellants' flight from Jardines de Oriente and into the tunnel, the government says, suggests they had planned out this endeavor beforehand. And as a result, the government tells us, a rational fact-finder could certainly infer that, in undertaking all of this planning, the Defendants would have realized that there was a school nearby.

Furthermore, the government reminds us that all of the Defendant-Appellants were residents of Humacao, and that all of them except for Mendoza-Ortega lived at Dr. Palou,[9] and that

---

[9]  We pause to address what appears to be a mistake in the district court's order on the Defendants' Rule 29 motions. In that order, the district court first stated that Otero-Márquez lived in the Dr. Palou housing project, while Mendoza-Ortega did not, though he did live elsewhere in Humacao. But in the next paragraph, after considering the arguments of the residents of the Dr. Palou projects, the district court remarked that "Edwin Otero-Márquez was a resident of Humacao and had been spotted with several co-defendants at the Dr. Palou housing project on another occasion. Hence, one can reasonabl[y] conclude that [he] knew the area well and was aware that the [School] was located on the same street as Dr. Palou . . . ." Thus, in this paragraph, the court appears to have confused Otero-Márquez, who was a resident of the Dr. Palou project, with Mendoza-Ortega, who was not. Ultimately though, this error is harmless, because we, like the district court, conclude that sufficient evidence established that Mendoza-Ortega

Government witness Officer Lebrón-Delgado testified that he had seen Mendoza-Ortega at Dr. Palou before the date of the shootout. And this is all particularly important because the School, a two-story building, is located on the same street as Dr. Palou. Additionally, the front of the School features signage identifying it as an elementary school.

We think that all of this would allow a reasonable fact-finder to conclude that all of the Defendant-Appellants either knew or should have known that they were in a school zone. It is difficult to imagine that the four Defendant-Appellants who lived at Dr. Palou were unaware of the existence of a school on the same street. Though Mendoza-Ortega did not live at Dr. Palou, we nonetheless find it reasonable to conclude that -- as a resident of Humacao who had visited Dr. Palou before -- he at least should have known that he was in a school zone. And for these same reasons, we also find it reasonable to conclude for Rule 29 purposes that the Defendant-Appellants all had "advance knowledge" of the School's location for purposes of aiding and abetting liability.

In summary, given the evidence at trial, a rational fact-finder could conclude the following: (1) at least one of the

_____

and Otero-Márquez should have known they were in a school zone.

Defendant-Appellants possessed a firearm, while the others aided and abetted him with advance knowledge; (2) the Defendant-Appellant(s) who possessed a firearm did so while in a school zone; and (3) all of the Defendant-Appellants had advance knowledge of the School's location. Thus, we hold that the government did introduce sufficient evidence of the Defendant-Appellants' culpability on Count Three, and that the district court did not err in denying their Rule 29 motions as to that Count.

**B. Fernández-Jorge's motion for acquittal on Count Three**

We now take up the government's challenge to the district court's grant of Fernández-Jorge's motion for acquittal. The thrust of the government's challenge is that, while not a resident of Humacao like the Defendant-Appellants, Fernández-Jorge nonetheless had ample reason to know he was in a school zone. In so arguing, the government leans on evidence that the School (though not any signage identifying it as such) was visible from the entrance to Jardines de Oriente and nearby roads, and on the ostensibly planned nature of the shootout and the Defendants' flight from it -- which, according to the government, suggests a certain level of familiarity with the area.[10]

---

[10] The government also maintained in its brief that the evidence of Fernández-Jorge's knowledge of the school zone was particularly strong "given the district court's observation that . . . 'the route passing in front of the school is a principal way to arrive at Dr. Palou.'" But the district court order does not indicate

But a number of considerations cut in the opposite direction. For one, as Fernández-Jorge stresses, none of the police officers who testified at trial had ever seen him in Humacao before the shootout. In fact, the government did not introduce any evidence that Fernández-Jorge had ever visited Humacao before the morning of the shootout. And we recall that the only part of the School actually visible from Jardines de Oriente is the roof of its basketball court, which, again, provides no indication that it is part of a school. Additionally, while it is possible that Fernández-Jorge, who lived in San Juan, may have passed the School's front entrance and seen the signs identifying it as a school on his way to Humacao, this is not necessarily so. For, Fernández-Jorge posits that in traveling to Jardines de Oriente from San Juan, one "would ordinarily take the more direct route," which does not involve driving past the School's front entrance. Setting aside the question of whether this route is in fact the

---

when at trial this was established, and the government has declined to provide a citation that would illuminate us on that score. We also observe that the government similarly cited only the district court order -- which, again, does not contain citations to the record -- for the proposition that the "front of the school contains the school's name and clearly identifies [it] as being an elementary school." We feel compelled to emphasize that -- particularly in the context of arguments concerning the sufficiency of the evidence -- neglecting to provide citations to the record in support of factual assertions is a poor strategic choice.

most intuitive or direct, we do take note of the existence of an alternative route -- a point the government concedes -- that would not have taken Fernández-Jorge past the front of the School.

In sum, the government's arguments do not differ significantly from those that we rejected in Guzmán-Montáñez. See 756 F.3d at 11-12. The government's only arguments that are not a variation of imputing knowledge of a school zone though mere physical proximity to a school involve the shootout's apparent premeditation and coordination, and the possibility that Fernández-Jorge drove past the front of the School on his way to Jardines de Oriente.[11]

But, even assuming that the Defendants did plan the shootout together, this would not have required them to have all visited Jardines de Oriente and its surrounding area with Fernández-Jorge in tow. Additionally, the School's seeming irrelevance to both the apparent objective of the Defendants' plan (to go to Jardines de Oriente and shoot firearms), and their

---

[11] In its brief, the government also tells us that the word "school" appears nearly 450 times in the trial transcript, and that while "some fraction of those mentions were at sidebar or otherwise outside the jury's hearing, the overall number is nonetheless indicative of the thoroughness with which the location of the school, its position relative to events, and its visibility were presented to the jury." Out of fear of inadvertently dignifying this argument with a longer discussion of it, we simply say here that we do not find it persuasive.

attempted escape through the tunnel, also weakens the suggestion that their advance planning would imply Fernández-Jorge's knowledge of the school zone. And we also find the less-than-certain possibility that Fernández-Jorge would have driven past the School en route to Jardines de Oriente insufficient to tip the scales towards the reasonable conclusion that he knew or should have known of its location. This inferential "leap," see id. at 12 -- particularly in the absence of any evidence that Fernández-Jorge had previously been to Humacao, or about how and from where he arrived at Jardines de Oriente on the day of the shootout -- is too large for a rational fact-finder to have made. Therefore, because the government fails to convince us that sufficient evidence supported the conclusion, beyond a reasonable doubt, that Fernández-Jorge knew or should have known of the School's location, we affirm the district court's grant of his motion for acquittal.

**C. Mendoza-Ortega and Otero-Márquez's motions for acquittal on Count One**

Turning now to Count One -- which charged Mendoza-Ortega and Otero-Márquez with possessing firearms as felons in the principal and aiding and abetting forms -- we begin by highlighting that Mendoza-Ortega and Otero-Márquez, and nobody else, stipulated that they had been previously convicted of crimes potentially punishable with over one year of imprisonment, a necessary element of that offense. See 18 U.S.C. § 922(g). Now, in reviewing the

district court's denial of their motions for acquittal as to that count, we ask if a rational fact-finder could have reached either of the following conclusions: (1) that Otero-Márquez and Mendoza-Ortega both possessed firearms; or (2) that one of these individuals possessed a firearm while the other aided and abetted him. This is so because these two are the only previously convicted felons among the Defendant-Appellants. And this is a crucial point. For, while Count Three required only that someone have possessed a firearm and that the rest of the Defendants have aided and abetted that person, Count One requires that at least one of two specific individuals -- that is, those with prior felony convictions -- possessed a firearm.

Harkening back to our earlier discussion of the government witnesses' trial testimony, see supra § II.A.1, while it is plain that at least one of the Defendants possessed firearms, there is scant evidence providing insight into who among the Defendants that may have been. Perhaps recognizing that it would face an uphill battle in attempting to show that any particular Defendant possessed a firearm, the government maintains that the evidence "permits the inference" that each of the seven Defendants possessed one of the seven firearms that police later found in the tunnel. And because the evidence that any one Defendant in particular possessed a firearm would be equally applicable to the

remaining Defendants,[12] it seems that the only possible conclusions to draw, for Rule 29 purposes, are that: (1) all seven Defendants possessed their own firearm; or (2) it is impossible to know which of the Defendants possessed firearms. As a result of all of this, our inquiry becomes this: Could a rational fact-finder have concluded beyond a reasonable doubt that each of the seven Defendants possessed exactly one firearm? Or, alternatively, we can frame the question as whether the government introduced sufficient evidence that none of the Defendants were unarmed.

In assessing whether the jury could permissibly conclude that, because the number of Defendants corresponds to the number of guns, each Defendant had one gun, we find it significant that only four of the guns were linked to the shootout. In theory, one of the strongest arguments against the notion that one or more of the Defendants was unarmed is essentially "who in the world would participate in a planned shootout unarmed?" But, while convincing in theory, this argument loses much of its persuasiveness here, when applied to the facts established at trial.

We are confident in our conclusion, as discussed with respect to Count Three, that a rational fact-finder could have

---

[12]  True, De la Cruz-Vázquez had ammunition on his person when he was arrested, but because he had not been previously convicted of a felony, this does not impact our analysis here.

concluded on the basis of the evidence at trial that the Defendant-Appellants had advance knowledge that one of their number possessed a firearm during the shootout in which they participated in some form. But, it does not follow that the evidence that all seven Defendants were involved in the shootout -- in some form -- was strong enough to serve as the basis for the further inferential leaps that are still necessary to land at the conclusion that all seven Defendants possessed a firearm. This is particularly so in light of our reluctance to "stack inference upon inference in order to uphold the jury's verdict." United States v. Burgos, 703 F.3d 1, 10 (1st Cir. 2012) (quoting United States v. Valerio, 48 F.3d 58, 64 (1st Cir. 1995)); see also United States v. Ruiz, 105 F.3d 1492, 1500 (while circumstantial evidence alone may provide sufficient evidence to uphold a verdict, we disfavor stacking inferences to uphold a conviction on the basis of purely circumstantial evidence).

Keeping in mind, once more, that only four of the seven guns were linked to the shootout, we are left with competing explanations as to why. It could be because three of the Defendants, while armed, simply elected not to shoot during the shootout. Or, it could also be that the Defendants who fired the guns that were linked to the shootout also possessed additional firearms that they did not use during the shootout. Or a

combination of these two things is also possible (e.g., two Defendants were unarmed, and two Defendants each possessed two guns, but only fired one).[13] We thus conclude that there was not sufficient evidence for a rational jury to have concluded, beyond a reasonable doubt, that _any_ of these scenarios was actually the case here. See United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995) (reversal is required when "an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, [because in such a case] a reasonable jury must necessarily entertain a reasonable doubt") (alteration in original).

In summary, as the only Defendants previously convicted of felonies, to convict Otero-Márquez and Mendoza-Ortega on Count One, the government needed to show that at least one of those two possessed a firearm. And, in the absence of any evidence that either was more likely than the remaining Defendants to have possessed firearms, to show that either of those two individuals possessed a firearm, the government needed to put on sufficient evidence that all seven Defendants did so. To arrive at that conclusion, the jury would have had to first infer from

---

[13] It is also theoretically possible that the Defendants were not responsible for bringing the three unfired guns into the tunnel, and that those guns were already there when they reached the tunnel. We find this less probable, though.

circumstantial evidence that all seven Defendants were involved in the shootout in some capacity, and then reject the possibility that any of the Defendants possessed more than one firearm. Thus, upholding the jury's verdict would require us to sanction both stacking inferences and choosing between two "equal or nearly equal" theories. Flores-Rivera, 56 F.3d at 323; see Burgos, 703 F.3d at 10. We decline to do so here, and hold that a rational fact-finder could not have found beyond a reasonable doubt that Otero-Márquez or Mendoza-Ortega possessed a firearm. We therefore hold that the district court erred in denying those two individuals' motions for acquittal on Count One.

### III. **The Jury Instructions for Count Three**

Having concluded that sufficient evidence supported the Defendant-Appellants' Count Three convictions, we now take up the question of whether the district court's jury instructions for that Count were erroneous.[14] At the end of the trial, Mendoza-Ortega filed a motion requesting that the district court's forthcoming jury instructions reflect Rosemond's "advance knowledge" requirement, see 134 S. Ct. at 1249. Otero-Márquez joined that request at the charge conference. On appeal, Mendoza-

---

[14] Because we conclude that insufficient evidence supported the Count One convictions, we need not reach the question of whether the district court's aiding and abetting instructions for Count One were erroneous.

-33-

Ortega and Pérez-Torres both assert that, because they failed to take Rosemond into account, the district court's aiding and abetting instructions for Count Three were erroneous.

This argument having been duly preserved, we must now determine de novo whether the requested instruction was "substantially covered by" the instruction that the district court actually gave. United States v. Baird, 712 F.3d 623, 628 (1st Cir. 2013); see also United States v. Godin, 534 F.3d 51, 56 (1st Cir. 2008) (our review of whether a trial court's jury instructions captured the elements of the relevant offense is de novo). Moreover, it is of no import that the jury returned a general verdict here that did not distinguish between the principal and aiding and abetting forms of the offense. A general guilty verdict cannot stand when it may have rested on constitutionally invalid grounds. See Griffin v. United States, 502 U.S. 46, 53 (1991) ("[W]here a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground.") (citing Stromberg v. California, 283 U.S. 359, 568 (1931)).

In light of the request made below, we must determine whether the district court's instructions adequately captured and impressed upon the jury Rosemond's requirement that to be guilty of aiding and abetting an offense, a defendant must have had

advance knowledge of each element of the offense. As Rosemond clarifies, "advance knowledge" is "knowledge that enables [a defendant] to make the relevant legal (and indeed, moral) choice." 134 S. Ct. at 1249. That is, the would-be accomplice must know of the principal's plan to commit the underlying offense with sufficient anticipation to be able to "attempt to alter that plan or, if unsuccessful, withdraw from the enterprise." Id. Only then may aiding and abetting liability attach.

Here, the district court instructed the jury that, to find the Defendants guilty of Count Three in the aiding and abetting modality, it needed to find, beyond a reasonable doubt, first that a principal committed the crimes charged, and "[s]econd, that the charged defendants consciously shared the other person's knowledge of the crimes charged in the indictment, intended to help each other, and took part in the endeavor, seeking to make it succeed."

Whether this formulation runs afoul of Rosemond depends on whether "seeking to make it succeed" applies to all of the clauses that precede it, or only to its immediate predecessor: "took part in the endeavor." If it applies to all of the preceding clauses, then we have no Rosemond problem because the instructions would require the jury to find that an alleged aider and abettor knew that the principal was to commit the crime of possessing a

gun in a school zone when he leant his assistance with the intent to make the criminal endeavor succeed. That would be consistent with Rosemond's advance knowledge requirement. But if the pronoun "it" in "seeking to make it succeed" refers only to "the endeavor," then we do have a Rosemond problem. In that case, the instructions would allow the jury to find a defendant guilty of aiding and abetting when the defendant (1) "took part in the endeavor, seeking to make it succeed" by (2) assisting the principal in bringing a gun to a particular location, and only then, upon realizing that this location was in a school zone, (3) "consciously shared" the principal's knowledge of the crime. That is, this interpretation of the instruction does not require the government to have proven that the aider and abettor shared the defendant's knowledge of the crime before or even at the moment when he chose to lend his assistance.[15] And that would conflict with Rosemond.

---

[15] It may be helpful to visualize these alternative interpretations in this manner. The instructions comported with Rosemond if this is their proper interpretation: "that the charged defendants [(consciously shared the other person's knowledge of the crimes charged in the indictment, intended to help each other, and took part in the endeavor), seeking to make it succeed]."

The instructions did not comport with Rosemond, though, if we interpret them this way: "that the charged defendants [(consciously shared the other person's knowledge of the crimes charged in the indictment), (intended to help each other), and (took part in the endeavor, seeking to make it succeed)]."

This second possible interpretation seems the more likely of the two because the instruction uses the singular "seeking to make it succeed," making it unlikely that this clause was meant to apply to the entire list of things preceding it, which includes the plural "crimes charged in the indictment."  At a minimum, it is distinctly possible that the jury interpreted the instructions this way.  As the Supreme Court has explained, when faced with ambiguous jury instructions, the proper inquiry is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  And it would indeed violate the Constitution if the jury convicted the Defendants on Count Three without the government having proven all of the offense's elements -- including "advance knowledge" -- beyond a reasonable doubt.  See Patterson v. New York, 432 U.S. 197, 210 (1977) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged.").

Finally, before vacating convictions as the result of instructional error, we must assess whether that error was harmless.  See Koonce v. Pepe, 99 F.3d 469, 473 (1st Cir. 1996); accord Hedgpeth v. Pulido, 555 U.S. 58, 61 (2008).  When jury

instructions fail to account for an element of the crime charged, that error is harmless only if we can conclude "beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." United States v. Pizarro, 772 F.3d 284, 297-98 (1st Cir. 2014) (quoting Neder v. United States, 527 U.S. 1, 17 (1999)). Here, this does not allow us to conclude that the district court's instructional error was harmless.

First, given the centrality at trial of the question of whether the Defendants knew of the School's location, we cannot describe the element of "advance knowledge" as uncontested. Moreover while we have concluded that, for Rule 29 purposes, a rational fact-finder could have found that the Defendants knew or should have known they were in a school zone, that requires far less than "overwhelming" evidence. In the end, we cannot say that overwhelming evidence established that the Defendant-Appellants had advance knowledge that the principal was to possess a firearm within 1,000 feet of a school. And so the error that infected the district court's aiding and abetting instructions was not harmless.

To conclude, there is a "reasonable likelihood" that the jury interpreted the district court's aiding and abetting instructions in a way that violates Rosemond. See Estelle, 502

U.S. at 72.  That error was not harmless.  See <u>Pizarro</u>, 772 at 297-98.  Therefore, because the jury's general verdict could have rested on a constitutionally impermissible ground, <u>see</u> <u>Griffin</u>, 502 U.S. at 53, we must vacate the district court's judgments of guilty as to Count Three for all of the Defendant-Appellants.[16]

---

[16] We have one last loose end to tie up.  Not all of the Defendant-Appellants requested a <u>Rosemond</u> instruction below, and not all of them claim on appeal that the district court's aiding and abetting instructions were erroneous.  But we do not think that this means that only those Defendant-Appellants who have raised this issue should have their convictions vacated.  First, the government has not taken this position.  <u>See</u> <u>United States</u> v. <u>Burhoe</u>, 871 F.3d 1, 28 n.33 (1st Cir. 2017) (finding that the government had forfeited any argument that the defendants had waived a particular issue).  The purpose behind our "waiver" doctrines also supports this conclusion.  Appellate courts are typically loath to consider forfeited arguments for two reasons.  The first concerns our institutional role as a court of review: we review the decisions that a lower court (or agency) has actually made.  <u>See</u> <u>Miller</u> v. <u>Nationwide Life Ins. Co.</u>, 391 F.3d 698, 701 (5th Cir. 2004) ("We have frequently said that we are a court of errors, and that a district court cannot have erred as to arguments not presented to it."); <u>see also</u> <u>HTC Corp.</u> v. <u>IPCom GmbH & Co., KG</u>, 667 F.3d 1270, 1281-82 (Fed. Cir. 2012) (emphasizing finality and judicial economy).  The second justification stems from the idea that it is unfair to allow parties to surprise one another with new arguments that they did not make at the appropriate procedural juncture.  <u>See</u> <u>Prime Time Int'l Co.</u> v. <u>Vilsack</u>, 599 F.3d 678, 686 (D.C. Cir. 2010) (quoting <u>Hormel</u> v. <u>Helvering</u>, 312 U.S. 552, 556 (1941)).

But here, vacating the convictions of only those Defendant-Appellants who have raised the <u>Rosemond</u> issue would vindicate neither of those interests.  The district court considered this issue and issued a ruling on it.  And the government -- both because this issue arose below and because some of the Defendant-Appellants took it up in their opening briefs -- certainly had sufficient notice of this issue at the appellate stage.  We therefore think that the district court's instructional error requires vacating <u>all</u> of the Defendant-Appellants' convictions on

## IV. Conclusion

While the Defendant-Appellants have raised additional claims of evidentiary error and challenges to their sentences, we need not reach them. See United States v. Sasso, 695 F.3d 25, 31 & n.1 (1st Cir. 2012) (vacating because of instructional error and then declining "to rule gratuitously upon the defendant's remaining assignments of trial and sentencing error" because "[i]t is unlikely that any of these claims will arise in the same posture if the case is retried"). With regard to Fernández-Jorge, the district court's judgment is affirmed. With regard to the Defendant-Appellants, the district court's judgment is reversed as to Count One and vacated as to Count Three.

**Affirmed, Reversed, and Vacated.**

---

Count Three. See United States v. Cardales-Luna, 632 F.3d 731, 736 (1st Cir. 2011) (explaining it is in the interests of justice to treat "materially identical cases alike"); cf. Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995) (appellate courts may exercise their discretion to forgive waiver when "the equities heavily preponderate in favor of such a step"). Lastly, we note that other courts faced with similar situations have invoked Fed. R. App. P. 2 -- which authorizes courts to suspend other rules sua sponte -- to forgive a defendant's failure to incorporate by reference arguments advanced in a co-defendant's brief pursuant to Rule 28(i). See United States v. Olano, 394 F.2d 1425, 1439 (9th Cir. 1991), rev'd on other grounds, 507 U.S. 725 (1993); United States v. Rivera-Pedin, 861 F.2d 1522, 1526 n.9 (11th Cir. 1988) (invoking Fed. R. App. P. 2's authorization "to relieve litigants of the consequences of default where manifest injustice would result"); United States v. Gray, 626 F.2d 494, 497 (5th Cir. 1980); United States v. Anderson, 584 F.2d 849, 853 (6th Cir. 1978).