# United States Court of Appeals
## For the First Circuit

No. 14-1325

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL T. PRIETO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Lynch, Stahl, and Kayatta,
Circuit Judges.

Jean C. LaRocque for appellant.
Seth R. Aframe, Assistant United States Attorney, with
whom John P. Kacavas, United States Attorney, was on brief, for
appellee.

January 20, 2016

**KAYATTA**, <u>Circuit Judge</u>.  The criminal prosecution giving rise to this appeal stems from a so-called mortgage rescue program organized and operated by Michael Prieto.  In brief, Prieto's organization garnered large sums of money, while homeowners, sham buyers, and lenders to whom Prieto and his operatives made a series of false representations ended up with substantial losses and liabilities.  The United States viewed the whole arrangement as fraudulent.  A jury agreed, convicting Prieto of mail fraud under 18 U.S.C. § 1341.  Prieto now appeals both his conviction and the portion of his sentence that fixes the amount of restitution that the district court ordered he pay to his victims.  Seeing no reversible error, we affirm.

## I.  Background

We begin by summarizing the evidence that sets the stage for evaluating Prieto's challenges to the sufficiency of the government's proof in support of the offense for which Prieto was charged and convicted.  In so doing, we take the evidence in a light favorable to the jury verdict.  <u>United States</u> v. <u>Burgos-Montes</u>, 786 F.3d 92, 99 (1st Cir.), <u>cert. denied</u>, 136 S. Ct. 599 (2015) (mem.) (sufficiency challenge); <u>United States</u> v. <u>Wihbey</u>, 75 F.3d 761, 774 (1st Cir. 1996) (variance challenge).

Prieto advertised the organization that he formed in 2005 and ran until 2008 (under various names) as a "mortgage rescue program" designed to assist homeowners struggling to make mortgage

payments. Prieto and his associates began by identifying distressed homeowners facing foreclosure and then solicited the participation of those homeowners through targeted advertising. The pitch to these homeowners was that Prieto's organization would tap a "pool of investors" to "get rid of this bad debt" and let participants stay in their homes. Individuals who signed up with Prieto agreed to transfer their homes to the organization. In return, the organization promised to satisfy each homeowner's delinquent mortgage obligation and to charge the homeowner a monthly rent that would be less than the homeowner's previous monthly mortgage payment. Homeowners were also promised the opportunity to repurchase their properties after two years of timely payments.

The organization then arranged sham transfers to straw purchasers who received lump sum payments from Prieto's group for their services. Falsely claiming, among other things, an intention to use the homes as primary residences, the straw purchasers then applied for residential mortgages, which were always larger than the original homeowner's mortgage and often equal to the total value of the underlying residence. The straws then executed quitclaim deeds, conveying the properties over to the organization.

The organization applied the funds from the new mortgages to the remaining balance on each original homeowner's

mortgage. Once that first mortgage was satisfied, Prieto's organization extracted the remaining funds in the second mortgage through one of two methods. One method, used from March 2005 to April 2006, was to have a corporation controlled by the organization file a false mortgage lien against the property before the transfer to the straw purchaser. The straw purchaser could then use the funds from the second mortgage to pay off the sham lien at closing. After being fined by a state regulator for this practice, the organization abandoned this method and began simply instructing straw purchasers to directly transfer the excess mortgage funds to one of the organization's corporations.

Prieto was ultimately involved in 86 transactions with a total of 30 mortgage lenders. While some of the homeowners managed to stay in their homes for a time at the reduced rent payments, Prieto's organization failed to stay current on the mortgage obligations. Foreclosure proceedings were instituted against nearly all of the organization's properties. The straw purchasers--who had been promised that their responsibility ended at the sham closing--unexpectedly found themselves on the hook for the unpaid mortgage obligations. Authorities ultimately arrested Prieto and five of his associates. The other members of the scheme entered guilty pleas pursuant to plea agreements and cooperated with the government's investigation and prosecution.

The ensuing indictment detailed all stages of the foregoing scheme, and expressly included all stages as parts of how "the scheme worked." It described deceit of homeowners, straws, and lenders, with loans collectively exceeding foreclosure proceeds by over $5 million. It packaged all averments under a single mail fraud count. In short, the indictment previewed the evidentiary proof of a single scheme that worked by deceiving and defrauding homeowners, straws, and lenders, all of whom were collectively left holding the bag for the sums Prieto extracted from the equity and the lenders.[1]

## II. Analysis

**A. The Indictment**

Prieto rests the bulk of his argument on a claim that the indictment improperly characterized a series of distinct criminal activities as a single, overarching scheme. Such an argument "implicate[s] both the doctrine of 'duplicity'--the joining of two or more distinct offenses in a single count of an indictment, and the doctrine of 'variance'--the presentation at trial of evidence that varies materially from the crime charged in the indictment." United States v. Trainor, 477 F.3d 24, 31 (1st

---

[1] The indictment also separately alleged a series of money laundering counts that the district court ultimately dismissed at the close of the evidence.

- 5 -

Cir. 2007) (citations omitted).  On appeal, Prieto argues both sides of this coin.

## 1.   Duplicity

We review preserved duplicity challenges to an indictment de novo.  United States v. D'Amico, 496 F.3d 95, 98 (1st Cir. 2007), cert. granted, judgment vacated on other grounds, 552 U.S. 1173 (2008) (mem.).  An indictment is improper if it joins, in a single count, two or more distinct offenses.  United States v. Canas, 595 F.2d 73, 78 (1st Cir. 1979).  The bar against such indictments is embodied in Federal Rule of Criminal Procedure 8(a), providing that separate offenses be charged in separate counts of an indictment.  This rule is born out of two concerns.  One concern is that a criminal defendant facing such an indictment might not know which charge to prepare to defend against.  United States v. Huguenin, 950 F.2d 23, 26 (1st Cir. 1991) (per curiam).  A second concern is that a jury could find a defendant guilty without actually reaching unanimity.[2]  United States v. Valerio, 48 F.3d 58, 63 (1st Cir. 1995).  These concerns find no toe-hold in this case.

---

[2] "For example, if Count X of an indictment charges a defendant with having committed two offenses, A and B, a conviction would be possible even if Jurors 1-6 found only that the defendant committed offense A, and jurors 7-12 found only that the defendant committed offense B."  United States v. Valerio, 48 F.3d 58, 63 n.2 (1st Cir. 1995).

First, the indictment created no risk that Prieto did not know which of several charges he needed to defend. The indictment made clear that the government undertook the burden of proving a single, overarching scheme. While the indictment naturally and informatively described the parts of the scheme, including lying to homeowners, straws, and lenders, it did so under the rubric of showing how "the scheme worked." Moreover, the very object of the scheme--pocketing cash paid out by the lenders-- would not have been achieved but for the predicate steps of deceiving the homeowners and the straws who could lose homes or assume liabilities as a byproduct of Prieto's setting up the surprisingly gullible lenders. From the outset, this was, in baseball parlance, a scheme to score a run, not a scheme to hit a double that coincidentally led later to several unanticipated stolen bases.

Second, there was no risk that the jury would find Prieto guilty without deciding unanimously that he was guilty of the overarching scheme. The government undertook the burden of proving such a single scheme rather than proving only one or several parts. Importantly, the district court also instructed the jury that the government had to prove beyond a reasonable doubt the "single or unified scheme . . . substantially as charged in the indictment."[3]

---

[3] The instructions ultimately given to the jurors on the meaning of a "scheme to defraud" were an abbreviated and modified

- 7 -

See United States v. Swantz, 380 F. App'x 767, 768 (10th Cir. 2010) (unpublished) (jury instructions are "a simple cure for duplicity").

Schemes to defraud are often, by their nature, complex. The accomplishment of a scheme's fraudulent goal and the simultaneous evasion of detection by its victims or the authorities often necessitate multi-faceted patterns of criminal activity that may harm different groups of victims at different times. See United States v. Buchmeier, 255 F.3d 415, 421 (7th Cir. 2001) ("[A]n indictment charging multiple acts in the same count, each of which could be charged as a separate offense, may not be duplicitous where these acts comprise a continuing course of conduct that constitutes a single offense."). Having put together such a multi-faceted scheme, Prieto can hardly protest that the government was willing to charge and bear the burden of proving such a scheme.

## 2. Variance

Next, Prieto argues that even if the government properly alleged a single scheme, its proof at trial unfairly varied from what was alleged and that this variance "prejudiced" his ability

version of Prieto's proposed instructions. Prieto objected to the instructions as given and now claims that the instructions failed to address the problem of duplicity. We find that the district court's clear statements to the jury regarding the need to find a "unified" scheme with a "substantial[]" relationship to that which was charged were adequate.

- 8 -

to defend himself. See United States v. Seng Tan, 674 F.3d 103, 110 (1st Cir. 2012). This argument draws from the same well as the duplicity claim, asking us to reverse the conviction because the government began the case alleging one set of facts "but the evidence adduced at trial proved different facts than those alleged in the indictment." United States v. Yelaun, 541 F.3d 415, 419 (1st Cir. 2008). To make out a successful variance challenge, Prieto is obligated to demonstrate both a factual variance (between the indictment and the trial) and prejudice to his substantial rights as a result of that variance. Id. A variance may prejudice the substantial rights of a defendant by, for example, depriving a defendant of notice of the charges, subjecting him to prosecution twice for the same offense, or exposing him to the threat that evidence incriminating other defendants might be used against him by a jury. See Wihbey, 75 F.3d at 774. Because Prieto raised the issue in his motion for judgment of acquittal, we review it de novo. Id.

Prieto argues, first, that the government's theory of harm at trial shifted away from one set of injured parties (homeowners) and toward other victims discussed in the indictment (lenders). Prieto also argues that the indictment's reference to "dozens of distressed homeowners" is in tension with the government's decision to call only one homeowner who had participated in the scheme out of the 19 the government noticed as

potential witnesses. More generally, Prieto contends that while the indictment charged him with responsibility for a single unitary scheme, at trial he was forced to defend against multiple schemes that had been "shoehorned" in together. As for prejudice, Prieto gestures broadly at the difficulty of defending against multiple schemes at trial and the risk of juror confusion.

Prieto can show neither variance nor prejudice. The government, at most, de-emphasized some parts of the indictment and re-prioritized others, or reduced its fire when it came to proving some of the indictment's allegations. The single overarching scheme conveyed in the indictment, however, lines up quite closely with the single overarching scheme proved at trial. Indeed, the detailed indictment serves as a fairly good roadmap of the government's case, delineating the various steps that needed to be taken for Prieto's overall scheme to achieve its goal. That other parties were collaterally injured on the way to the completion of the scheme does not increase the government's burden of proof. It was not obligated to demonstrate harm to every individual injured by Prieto's scheme. Cf. United States v. Doherty, 867 F.2d 47, 64 (1st Cir. 1989) (Even assuming that the case the government ultimately brought at trial was a "simpler, stripped-down version of the general [scheme], this variance would not entitle [the defendant] to a new trial."). Whatever departures

the government made from its indictment in its case at trial did not affect Prieto's "substantial rights." Wihbey, 75 F.3d at 774.

**B.   Sufficiency of the Evidence**

Prieto argues that the evidence offered against him is insufficient to support his conviction, and specifically that the government's case came up short on two key elements: materiality and intent.

**1.   Materiality**

Prieto argues that he should be acquitted because the government failed to offer sufficient evidence proving his misrepresentations were material to the lenders' decision-making. Because he made this argument at the close of the trial under Federal Rule of Criminal Procedure 29, we review his arguments de novo, affirming unless we find that "no rational jury could have found [the defendant] guilty beyond a reasonable doubt." United States v. Guerra-Garcia, 336 F.3d 19, 22 (1st Cir. 2003).

In a prosecution for mail fraud, the government must prove that the false or fraudulent representation at the heart of a "scheme to defraud" is material, Neder v. United States, 527 U.S. 1, 25 (1999), though it "need not prove that the decisionmaker actually relied on the falsehood or that the falsehood led to actual damages." United States v. Appolon, 715 F.3d 362, 368 (1st Cir. 2013). Proving materiality requires the government to show that the false statements relied on had "a natural tendency to

influence, or [are] capable of influencing, the decision of the decisionmaking body to which [they were] addressed." Id. (quoting Neder, 527 U.S. at 16).

In Appolon, we ruled that in a wire-fraud prosecution stemming from a mortgage fraud scheme, the government need not produce evidence at trial showing that the specific lending officers at the harmed banks actually relied on the defendant's misrepresentations. Id. at 367–69. In that case, the government's evidence that the victim lender had "explicitly sought" information from the fraudulent applicant and had received false information in return satisfied the government's burden on that element. Id. at 368. We ruled that "[t]he fact that [the lender's] loan application explicitly sought [certain] information from the applicant indicates that [the defendant's] responses were capable of influencing its decision." Id. This evidence was helpfully accompanied by testimony from an officer of a different mortgage lender about the range of criteria relevant to that lender's loan processing procedures. Id. at 368–69.

At Prieto's trial, the government introduced copies of loan application materials containing numerous misrepresentations that Prieto's organization had submitted to lenders. In response to direct questions on these forms, the straw purchasers falsely claimed that they intended to use the homes in question as primary residences and misstated--often vastly--the extent of their

personal income and assets.  The government also elicited testimony from John Duris, a mortgage broker with a decade of experience in the industry and a cooperating witness who had submitted numerous loan applications on Prieto's behalf.[4]  A lay witness, Duris testified that based on his professional experience, whether a loan application stated that a property was being used as an investment (as was arguably true here) or as a primary residence (as the applications falsely stated) could often determine whether a loan would issue because lenders considered properties intended to be used as primary residences far less risky.  Prieto argues that because Duris did not have insight into the particular underwriting practices of the victim institutions during the relevant time period, his testimony did not speak to the materiality of Prieto's misrepresentations.  But this overinflates the government's burden: it need only show that the statements had "a natural tendency to influence" the lenders' decisions, not that the specific lenders "actually relied" on the statements Prieto caused to be submitted.  Appolon, 715 F.3d at 368 (quoting Neder, 527 U.S. at 16).  Testimony about risks in making loans was relevant to the former even if not the latter.

As in Appolon, these two sources of evidence--the documents showing that the lenders required the applicants to

---

[4] Duris had not, however, worked for any of the victim institutions.  Nor had he been employed as a loan officer.

- 13 -

supply the requested information and the testimony about why the answers to these standard questions could be relevant to any lender --provided more than enough foundation for the jury to decide that materiality was satisfied.  Cf. United States v. Vernon, 593 F. App'x 883, 889 (11th Cir. 2014) (unpublished per curiam), cert. denied, 136 S. Ct. 333 (2015) (mem.) (mere introduction of and testimony to submitted loan applications with false income, liability, and primary residence declarations at trial sufficient to prove materiality).  Even in the face of anecdotal evidence that, at the time, residential mortgage lenders were devoting scant resources to the verification of applicants' income levels, it is nevertheless fair to presume that a loan applicant's stated income level and plans for using the property in question would have a "natural tendency" to influence a lender's decision.  Id. at 888. Why else, after all, did the lender demand the information and Prieto take the risk of providing false information?

### 2.    Intent

In a mail fraud prosecution, the government need prove "the defendant's knowing and willing participation in the scheme with the intent to defraud."  United States v. Hebshie, 549 F.3d 30, 35 (1st Cir. 2008) (quoting United States v. Cheal, 389 F.3d 35, 41 (1st Cir. 2004)).  Prieto claims that the trial produced insufficient evidence that he possessed such an intent. Specifically, he argues that the government produced no evidence

that would have allowed a jury to find that he intended to defraud the lenders.

Prieto did not raise this specific argument in his oral Rule 29 motion. In that motion, he raised several specific objections and, glancingly, a general objection to the evidence's sufficiency. As we have previously observed:

> We have not decided what happens when a general sufficiency objection is accompanied by specific objections, but we have suggested, albeit in dictum, that such a practice preserves all possible objections because: "[i]t is helpful to the trial judge to have specific concerns explained even where a general motion is made; and to penalize the giving of examples, which might be understood as abandoning all other grounds, discourages defense counsel from doing so and also creates a trap for the unwary defense lawyer."

United States v. Lyons, 740 F.3d 702, 716 (1st Cir. 2014) (quoting United States v. Marston, 694 F.3d 131, 135 (1st Cir. 2012)).

We need not settle on the proper standard of review here because Prieto's argument that the evidence was insufficient to prove his "intent" fails under any standard. Prieto was shown to have built and run for years an organization that generated income for him only because it systematically defrauded lenders into loaning to "buyers" who were not what they claimed to be. To put a finer point on it, one of the sham borrowers explained how Prieto himself put his money into her bank account to make it look like she had assets that she did not and how she discussed with Prieto

- 15 -

on one occasion the need to falsely claim residency on a loan application.  In short, there was ample support to find Prieto was both the conductor and a musician in an orchestrated fraud that worked for a while only because it was fraud.  On such a record, any rational jury could find that Prieto intended his organization to do that which he designed it to do in order to sustain itself and enrich him.

## C.    Other Trial Issues

Prieto points to a grab bag of alleged errors made at various points during, and shortly after the close of, his trial.

### 1.    Expert Consultant Funds

Prieto's defense advanced the theory that the straw buyers' misrepresentations on the loan application documents would have been immaterial to lenders' decision-making due to the highly permissive atmosphere that permeated the residential mortgage lending industry during the relevant years.  To that end, Prieto sought to hire a mortgage industry specialist who could assist defense counsel as a "consultant" and potentially testify as an expert witness at trial as to the laxity of loan verification procedures followed by lending institutions in the processing of loan applications.  Prieto's request for $10,000 in funding under the Criminal Justice Act ("CJA") was denied without prejudice by the district court judge for "exceed[ing] the norm for expert services" and being "inadequately justified, given the absence of

- 16 -

a clear statement of relevance to any potential defense that might be offered."[5] A second request for the funding led to an ex parte hearing with defense counsel at which the court approved $3,000 in funding to hire a mortgage industry specialist as a consultant. See 18 U.S.C. § 3006A(e)(1) (contemplating "appropriate inquiry in an ex parte proceeding" when services beyond basic legal representation are requested). At the hearing, the district court judge left the door to more funding open, stating that if defense counsel decided to seek additional funding the court would require an "extended legal brief" outlining the relevance of the testimony and a proffer as to what, exactly, the expert would testify to. Prieto did not use the $3,000 to hire a consultant and did not reapply for more funding. He now argues that the court's requirements for justifying the funding denied him his ability to mount a proper defense and his right to a fair trial.

Prieto's entitlement to public funding to employ an expert is, in the first instance, governed by statute. Under the CJA, an indigent criminal defendant may request, from the presiding judge, funding to "obtain investigative, expert, or other services necessary for adequate representation." Id. Determining whether a defendant has met that standard is necessarily a context-

---

[5] The fact that Prieto's business garnered large sums of money unlawfully did not mean that it succeeded financially in the face of the market crash. By the time of trial, Prieto was deemed financially eligible for CJA funds.

dependent and sensitive inquiry. We afford district court and magistrate judges considerable leeway in reaching that decision, United States v. Abreu, 202 F.3d 386, 389 (1st Cir. 2000), and will not reverse a conviction based on the denial or limitation of funding absent a "clear and convincing" showing that the constraint prejudiced the defendant, United States v. Canessa, 644 F.2d 61, 64 (1st Cir. 1981) (quoting United States v. Eagle, 586 F.2d 1193, 1197 (8th Cir. 1978)).

The district court's decision to limit the grant of CJA funding was animated by two distinct concerns, each of them clearly valid given the particular context of this trial. In the ex parte hearing, the district court judge questioned the probative value of the expert's intended testimony on the subject of materiality. The district court also questioned the admissibility of the proffered testimony based on the evidentiary rules governing hearsay and expert testimony.

The district court's skepticism about the proposed testimony was well taken. Simply put, the fact that a lender did not verify an applicant's qualifying statements on the application casts little light on whether the lender may have been influenced to deny the application had the applicant told the truth. Indeed, the proposed testimony--to the effect that many lenders undertook no independent due diligence--could well be seen as suggesting that the lender relied on the information supplied by the borrower.

Whether such skepticism justified a denial of funding we need not decide because the district court provided some funding, and granted Prieto leave to convince it that more funding was needed. Prieto's decision not to use any of the funds, and not to accept the court's invitation to address its skepticism more adequately, provided further cause for that skepticism, and leave him in no position to argue that the district court clearly erred in not finding that additional services of a consulting expert were "necessary for [Prieto's] adequate representation." 18 U.S.C. § 3006A(e)(1).[6]

## 2. Money Laundering Instructions

On the last day of trial, the district court granted Prieto's motion for acquittal of the ten money laundering charges against him on the basis of the Supreme Court's holding in United States v. Santos, 553 U.S. 507 (2008) (plurality opinion).[7] The

---

[6] It follows that the limitation on funding and the effective exclusion of the industry witness did not affect Prieto's due process right to a fair trial. United States v. Butt, 955 F.2d 77, 85 (1st Cir. 1992) ("A trial judge has wide discretion concerning the admission of expert testimony, and we sustain such decisions where there has been no abuse.").

[7] In Santos, the Supreme Court limited the reach of the federal money laundering statute, 18 U.S.C. § 1956, to preclude prosecution of those individuals charged with laundering the "proceeds" derived from a given criminal activity when the "proceeds" were merely being reinvested to sustain that very activity. Id. at 514 (plurality opinion). The bases of the money laundering charges against Prieto were the payments made by his organization to the straw purchasers in return for their participation in the scheme. In dropping the charges, the district court ruled that the payments

court excised all references to the money laundering charges from the instructions read to the jurors. The jurors were instructed:

> You were previously advised that the indictment in this case contained one count charging mail fraud and ten counts charging money laundering. The money laundering counts are no longer before you and it will not be necessary for you to return a verdict on those counts. Only the charge of mail fraud is before you.

Prieto did not object to these instructions at the time, nor did he propose alternative ones. He now argues that these instructions failed to provide "clear direction" to the jurors on how to separate the money laundering evidence from the scheme to defraud evidence.

We review an unpreserved objection to jury instructions for plain error. United States v. Colon, 744 F.3d 752, 757 (1st Cir. 2014). Seeking reversal under this standard, Prieto faces the "heavy burden of showing (1) that an error occurred; (2) that the error was clear or obvious; (3) that the error affected his substantial rights; and (4) that the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Riccio, 529 F.3d 40, 46 (1st Cir. 2008).

---

ran afoul of Santos since they amounted to only one necessary step in the perpetration of the larger scheme.

- 20 -

It is a burden he cannot shoulder. Here, the instructions to the jury, considered as a whole, see Colon, 744 F.3d at 757, effectively steered jurors clear of the money laundering charges and sufficiently guarded against the danger that reasonable jurors would have thought those charges were still in the mix. The jury instructions did not infect the trial with plain error.

### 3. Restitution Loss Amount

The Pretrial Sentencing Report proposed a loss calculation and an award of restitution, each in the amount of $5,617,555. Prieto objected to both in his sentencing memorandum. With respect to the amount of restitution, he challenged both the method of calculating the amount, and the imposition of any amount in the absence of returned victim impact statements from those presumed to have suffered the losses to be remedied by the payment of restitution.

At the sentencing hearing itself, the court and counsel first discussed the method of fixing the loss calculation under the Guidelines. The court sided with Prieto. The district court then directly asked Prieto's counsel if there were "any other objections." In response, counsel pressed the same methodology objection she made concerning the Guidelines loss calculation, concluding that "we believe that the restitution is that $2,370,263.70, his portion." The court then confirmed with all

present whether that calculation was correct. After all agreed, the court again asked if there were "any other objections." "Not to this," replied counsel for Prieto.

Now, on appeal, Prieto seeks to revive his earlier argument that the absence of any returned victim impact statements precludes an award of any amount of restitution. Based on the foregoing record, counsel's discussion with the court either waived such an argument or, by itself, provided "a rational basis in the record" to support the amount. United States v. Salas-Fernández, 620 F.3d 45, 48 (1st Cir. 2010).

### III. Conclusion

Finding no reversible error, we affirm Prieto's conviction and the award of restitution.