# United States Court of Appeals
## For the First Circuit

No. 24-1988

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD EVANS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Montecalvo, Lynch, and Kayatta,
Circuit Judges.

Martin G. Weinberg, with whom Michael Pabian was on brief, for appellant.

Mark T. Quinlivan, Assistant United States Attorney, with whom Leah B. Foley, United States Attorney, was on brief, for appellee.

July 1, 2025

**LYNCH**, **Circuit Judge**.  Former Boston Police Department (BPD) Captain Richard Evans appeals his federal convictions arising out of his submission of false claims to BPD for overtime pay and his participation in a scheme to submit such claims.  We affirm Evans' convictions for wire fraud and conspiracy to commit wire fraud.  We vacate his substantive federal programs theft conviction and his conviction for conspiracy to commit federal programs theft and remand for further proceedings consistent with this opinion.

**I.**

Because Evans challenges the sufficiency of the evidence supporting his convictions, we recite the facts in the light most favorable to the jury's guilty verdicts.  United States v. DeCologero, 530 F.3d 36, 47 (1st Cir. 2008).  We recount the general background facts related to Evans' conviction here and leave more detailed recitation of facts for the analysis of particular arguments.

Evans entered BPD's police academy in 1983 and was promoted to the rank of Captain on January 20, 2010.  Captain is the highest-ranking position within the BPD that can be achieved without being appointed by the Police Commissioner or Mayor.  There are approximately twenty Captains within the BPD overseeing a police force of approximately 2,200 officers.  Captains are responsible for knowing BPD rules and regulations, as well as the

content of any memos disseminated by the Commissioner. BPD officers seeking promotion to Sergeant, Lieutenant, or Captain are sometimes tested on BPD rules and regulations during their promotional exams. BPD officers in a supervisory position, such as Evans, are also responsible for monitoring the activity of their subordinates to ensure that there is no illegal conduct occurring.

After being promoted to Captain, Evans headed BPD's Court Unit. On May 19, 2012, Evans was transferred, becoming commander of BPD's Evidence and Supply Management Division. In that position, Evans oversaw several of the Evidence and Supply Management Division's sub-units, including the Evidence Control Unit (ECU). The ECU is responsible for maintaining and storing evidence collected in the course of BPD investigations and for preparing evidence to be delivered to courts as needed. During the relevant period charged in the indictment, under Evans' command the ECU was staffed by approximately ten officers and two Sergeants (all of whom we will call officers), who worked shifts that ran from 7:30 A.M. to 4:00 P.M., Mondays through Fridays. The ECU was housed in a building, about four to five miles from police headquarters, which was equipped with interior alarms and motion detectors, as well as a master perimeter alarm. Once the master perimeter alarm was set, the presence of anyone in the building would trigger the motion detectors and alarm.

BPD maintained a policy known as "purge overtime," put in place to address dwindling storage space in the ECU. ECU staff could opt to earn such overtime. Purge overtime began under Evans' predecessor and continued throughout Evans' tenure. Under this policy, ECU officers were permitted to work overtime shifts to "purge" old and unneeded evidence, organize evidence that was to be retained, and scan old evidence into computer tracking systems. Purge overtime shifts were typically available on Mondays through Thursdays from 4:00 P.M. to 8:00 P.M., after the end of officers' regular 7:30 A.M. to 4:00 P.M. shifts. Each officer was authorized to work up to four hours of purge overtime, four nights a week. Each shift was performed by approximately four ECU officers and one supervisor. The ECU was not open on weekends.

To submit claims for overtime pay, officers fill out overtime slips, which are reviewed and approved by that officer's supervisor and then sent to the BPD's payroll unit for processing. The overtime slips, which BPD has used since 2004, have pre-printed boxes in which officers write the start and end time of their overtime shifts and the hours worked during the shift. The slip states in bold, underlined text that officers should report the "Actual Hours Worked."

The overtime slip also requires supervisors to assure the accuracy of an "overtime code." The overtime slip states: "Overtime codes are grouped into four broad categories identified

by the first number of [a] three-digit code." Those codes indicate to the BPD payroll department the reason for which the overtime was authorized. Relevant to this appeal are the series of codes beginning with the number "two," which indicate that "[o]vertime is authorized because an employee has to work an additional tour or is called out for duty," and the series of codes beginning with the number "three," which indicate that "[o]vertime is authorized because the employee is working an extended shift/tour." The overtime slip states that "[i]t is the responsibility of the supervisor authorizing the overtime or the captain's designee, not the officer submitting the overtime slip, to enter the appropriate overtime code." The slip states that these "[o]vertime codes are listed on a Commissioner's memorandum that is updated periodically. It is the supervisor's responsibility to ensure that the current list [is] used."

The overtime code used on a slip dictates how the overtime will be paid. Overtime codes beginning with a two are paid as a four-hour minimum, regardless of the actual hours worked, while overtime codes beginning with a three are paid on an hour-by-hour basis, in fifteen-minute increments. Only the overtime code assigned to work affects the way overtime is paid, not the type of work performed.

When BPD first began using the overtime slips in 2004, the Commissioner circulated a memo notifying BPD officers that

- 5 -

they were required to list on their slips the "[a]ctual hours worked, time between start and end of overtime performed." The memo further stated:

> Start time, military 24-hour time, end time, military 24-hour time. The boxes must be filled in using the actual start and end times in military 24-hour time, as stated. The computer program will make the adjustment to pay the four-hour minimum when contractually required if the actual time is less than that.

BPD's overtime policies are also laid out in a Collective Bargaining Agreement (CBA) between the City of Boston and the Boston Police Superior Officers Federation, which is the collective bargaining unit for uniformed Sergeants, Lieutenants, and Captains. Membership in this collective bargaining unit is automatic upon promotion to Sergeant, Lieutenant, or Captain. Pursuant to the CBA, member officers are paid 150% of their salary for any overtime worked. The CBA lists two circumstances in which officers are entitled to use overtime codes beginning with a two and to be paid for a minimum of four hours of overtime regardless of the time actually worked. The first circumstance is "court time," which provides for a four-hour minimum overtime payment for any officer that is required to testify in court. The second is "recall time," which occurs when an officer has finished a shift but is required to return to work to address an emergency or other issue. When officers work overtime that entitles them to a minimum of four hours of overtime pay, they are still expected to report

the actual start and end times of their overtime shift on their overtime slips.  Officers receive on-the-job training about BPD's overtime policies and, at roll call, are sometimes advised as to what codes should be used when submitting overtime and of the importance of listing the actual hours worked on overtime slips.

As the Captain in command of the ECU, Evans attended biweekly "CompStat" meetings with others in command positions.  At those meetings, commanders and supervisors undertook statistical analysis of various BPD strategic goals to determine whether those goals were being achieved.  Some of these CompStat meetings dealt specifically with issues related to overtime, and Captains were required to give presentations explaining their overtime expenditures, including how those expenditures were used and whether they were within that Captain's assigned budget.  Captains who were exceeding their overtime budgets were required to explain why and what steps were being taken to reduce their overtime expenditures.  The Chief of Police also began requiring supervisors to attend a separate briefing specifically about overtime following each CompStat meeting because of dramatic increases in overtime within the department.  At these overtime briefings, supervisors were again required to discuss and justify the overtime expenditures that occurred within their division.

Purge overtime shifts were not included in the CBA as a type of overtime shift which entitled officers to a minimum of

four hours of overtime. Nevertheless, at an informal meeting led by two ECU Sergeants that occurred prior to Evans' transfer to the ECU, ECU officers determined that they would work split overtime shifts, where two officers each worked two hours of a four-hour shift, as long as twenty cases were "purged" by each officer during that shift. During these split shifts, two officers worked from 4:00 P.M. to 6:00 P.M. and two others worked from 6:00 P.M. to 8:00 P.M. All officers reported on their overtime slips that they worked four hours each shift using an overtime code beginning with the number "three" and were paid four hours of overtime for their two-hour shifts. This use of split shifts was the practice among ECU officers when Evans took command of the Evidence and Supply Management Division.

At some point after Evans took command of the Evidence and Supply Management Division, the way in which officers worked and reported their purge overtime changed in response to the introduction of a new, computerized evidence-tracking system in the ECU. Officers began starting their purge overtime shifts all at 4:00 P.M., rather than splitting shifts. Those officers continued to work less than four hours, often ending their shifts between 5:30 P.M. and 6:00 P.M. The officers continued to use overtime codes beginning with the number "three" and to report working four-hour overtime shifts, from 4:00 P.M. to 8:00 P.M., although they did not work four hours. Between April 1, 2015 and

March 21, 2016, after the ECU officers had stopped working split shifts and began working simultaneous purge overtime shifts, Evans and other officers submitted a total of 1,139 overtime slips in which they certified that they had worked four hours of purge overtime. Of those, 753 were from days where the ECU was closed and alarmed by 6:00 P.M.

The BPD's Anti-Corruption Division opened an investigation into the ECU's overtime practices. The Anti-Corruption Division reviewed overtime slips from ECU officers, conducted surveillance of the ECU's overtime practices, and compared alarm records at the ECU with payroll records. In time, this investigation expanded to involve the Federal Bureau of Investigation and the U.S. Attorney's Office.

On March 29, 2021, a federal grand jury indicted Evans on one count of federal programs theft in violation of 18 U.S.C. § 666(a)(1)(A) or aiding and abetting such theft, one count of conspiracy to commit federal programs theft, three counts of wire fraud in violation of 18 U.S.C. § 1343 or aiding and abetting such wire fraud, and one count of conspiracy to commit wire fraud.

After a five-day jury trial, Evans was convicted of all counts. On October 24, 2024, Evans was sentenced to one year and one day of incarceration for each count, served concurrently, fined $15,000, and ordered to pay $17,390.99 in restitution.

**II.**

Evans raises two primary challenges to his convictions. He argues that the district court erred in giving the jury a willful blindness instruction and that the evidence at trial was insufficient to satisfy § 666's requirement that BPD received more than $10,000 in federal benefits. The parties disagree as to whether these challenges were properly preserved.

Evans also argues that the district court committed other errors that the parties agree were not timely objected to at trial: (1) failure to instruct the jury regarding § 666's federal benefits requirement; (2) failure to properly instruct the jury as to the defense of good faith; (3) failure to instruct the jury that aiding and abetting liability requires "advance knowledge" of the circumstances constituting the offense; and (4) permitting the introduction of improper testimony.

## A. Challenge to Willful Blindness Instruction

Because we conclude that Evans properly preserved his objection,[1] we turn to his claim that there was no evidentiary support for a willful blindness instruction.[2]

"A willful blindness instruction is meant to 'inform[] jurors that they may "impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps."'"  United States v. Bray, 853 F.3d 18, 30 (1st Cir. 2017) (alteration in original) (quoting United States v. Griffin, 524 F.3d 71, 77 n.4 (1st Cir.

---

[1]    During a conference held prior to closing arguments, the district court informed Evans that it would be giving the jury a willful blindness instruction.  At that time, Evans' counsel stated "just for the record, respectfully, can I take an objection to the willful blindness addition?"  To which the district court responded: "Yeah.  And let's renew that when I finish the instructions. . . . So that it's officially on the record."  After the district court instructed the jury, it prompted Evans' counsel at sidebar to renew his objection to the willful blindness instruction.  The transcript reflects that Evans' counsel objected to "the willful, blameless."  The parties agree that this appears to be an error in transcription.  Though the government argues that Evans failed to alert the district court to the grounds for his objection, "we think that the district court likely understood the thrust of the objection." United States v. Randazzo, 80 F.3d 623, 632 (1st Cir. 1996).

[2]    This court has been inconsistent as to the standard of review that applies when reviewing a preserved challenge to a willful blindness instruction, at times reviewing such challenges de novo, and at others for abuse of discretion.  See United States v. Kanodia, 943 F.3d 499, 508 (1st Cir. 2019) (noting competing standards).  We need not reach this issue because Evans' challenge fails under either standard.

2008)). "A willful blindness instruction is appropriate if (1) a defendant claims a lack of knowledge, (2) the facts suggest a conscious course of deliberate ignorance, and (3) the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge."[3] United States v. Azubike, 564 F.3d 59, 66 (1st Cir. 2009). "Direct evidence of willful blindness is not required." Id. To determine whether the facts suggest a conscious course of deliberate avoidance, "we must consider whether the record evidence reveals 'flags' of suspicion that, uninvestigated, suggest willful blindness." United States v. Epstein, 426 F.3d 431, 440 (1st Cir. 2005) (quoting United States v. Coviello, 225 F.3d 54, 70 (1st Cir. 2000)).

A willful blindness instruction was appropriate in this case.[4] As to the first requirement of lack of knowledge, Evans argued that he did not know that the way he and his subordinates logged their overtime was inappropriate because, by the time he took command of the ECU, it was "already the culture."

As to the second requirement, there were enough "flags of suspicion" to suggest a conscious course of deliberate

---

[3] Evans does not argue that the instruction could be misunderstood as mandating an inference of knowledge, and so we do not address this third aspect of the test.

[4] The parties disagree about what counts the district court's willful blindness instruction related to, and by extension which counts would be impacted by any error. Because we hold that there was no error, we need not and do not reach this issue.

avoidance. See id. (quoting Coviello, 225 F.3d at 70). As a Captain, Evans knew that the ECU's purge overtime practices were inconsistent with all of the BPD's overtime policies. Evans was an extremely high-ranking and experienced BPD official, having served in various positions for more than thirty years. BPD overtime policies were clearly communicated to him in a number of ways, including the CBA to which he was subject, memos from the Commissioner, and on-the-job training. To become a Sergeant, Lieutenant, and Captain, Evans had to pass promotional exams that could test on BPD overtime policy. The slips which Evans and his subordinates used to submit their overtime explicitly stated, in bold and underline, that the officers should report the "Actual Hours Worked."

Indeed, the evidence showed that Evans and the other officers knew that they would not receive four hours of overtime pay for purge overtime shifts unless they falsely certified that they had worked for four hours. This was a function of the overtime code used to classify purge overtime, which began with the number "three" and only paid the actual hours worked. When Evans first joined the ECU, he submitted his overtime slips in compliance with BPD policy and listed his actual start and end times and actual hours worked. For those shifts where he reported the actual hours worked Evans was paid for only those hours. Evans then began falsely certifying that he worked four-hour purge overtime shifts

and began to be paid for four hours of overtime. The repeated inconsistencies between the ECU overtime practices and BPD overtime policy were flags of suspicion that should have prompted Evans to further investigate the permissibility of the ECU's practices.

The practice of submitting overtime for periods in which no ECU officer was working a purge overtime shift was, itself, a flag of suspicion. Evans worked shifts where he could observe firsthand that officers were not working the full four-hour shift that they subsequently logged, yet he certified those obviously falsified overtime slips. He also certified overtime slips that listed hours worked during periods when the ECU was closed. Evans received "relentless[]" reminders from his superiors at CompStat meetings and elsewhere that reducing and justifying overtime expenditures was a high priority for BPD.

Evans argues that he had no reason to investigate these flags of suspicion because the ECU's overtime practices were already in place when he took command of the Unit. We disagree. Evans' argument also overlooks the simple fact that, even if some of the ECU's overtime practices, such as the use of split shifts, predated his tenure as supervisor, ECU officers transitioned away from split shifts under Evans' watch to a system under which officers logged overtime for hours in which the ECU was closed and alarmed.

Evans' conduct also supports that he was engaged in a conscious course of deliberate avoidance. When he was supervisor of the BPD's Court Unit, Evans sent an email to his superior officer inquiring as to how overtime should be handled in that Unit. This is consistent with the typical practice for seeking clarification of BPD's overtime policies. Evans' failure to seek clarification as to the policies governing purge overtime suggests that he deliberately avoided learning whether the ECU's purge overtime practices comported with BPD policy.

Given the numerous flags of suspicion and Evans' conspicuous failure to seek clarification from his superiors, a willful blindness instruction was appropriate.

## B. Challenge to Sufficiency of Evidence as to Both Convictions Under 18 U.S.C. § 666 Benefits Element

Evans next argues that the government failed to produce sufficient evidence to establish that the BPD received more than $10,000 in federal benefits during the time periods relevant to Evans' federal benefits theft and conspiracy to commit federal benefits theft convictions. We agree.

"Section 666 of Title 18 of the United States Code prohibits acts of theft and fraud against organizations receiving funds under federal assistance programs." Fischer v. United States, 529 U.S. 667, 675 (2000). Section 666 requires that "the organization, government or agency" affected by the charged

- 15 -

offense "receive[d], in any one year period, benefits in excess of $10,000 under a Federal program."  18 U.S.C. § 666(b).  This is often referred to as § 666's "jurisdictional element."  See United States v. DeQuattro, 118 F.4th 424, 428 (1st Cir. 2024).  But "not all federal funds constitute 'benefits' under the statute."  United States v. Bravo-Fernández, 913 F.3d 244, 247 (1st Cir. 2019).  Only federal monies that "guard[], aid[], or promote[] well-being" may qualify as "benefits" within the meaning of § 666(b).  Fischer, 529 U.S. at 677 (quoting Webster's Third New International Dictionary 204 (1971)).  "To determine whether an organization participating in a federal assistance program receives 'benefits,' an examination must be undertaken of the program's structure, operation, and purpose."  Id. at 681.

At trial, the government called as a witness Lisa O'Brien, then-Bureau Chief for the BPD's Bureau of Administration and Technology, and BPD's Finance Director from 2012 to 2017.  O'Brien testified that, as Finance Director, she oversaw, among other things, the federal grants BPD received.  O'Brien testified that BPD received more than $10,000 in federal funds each year from 2012 to 2019.  O'Brien also prepared a report on the specific federal funds BPD received, which was incorporated into the record as a government exhibit.  This report listed the name of each grant, the amount awarded, the amount expended, and the start and end date of the grant.  O'Brien identified two grants that paid

- 16 -

more than $10,000 to BPD during a one-year period relevant to Evans' federal benefits theft charges: a "Boston Community-based Violence Prevention Grant" and a "VAWA STOP Grant."[5] O'Brien testified that the Community-based Violence Prevention Grant was a $2.9 million grant, disbursed quarterly, and ran from December 1, 2015 through September 30, 2017. As to the VAWA STOP Grant, she testified that it was a "Violence Against Women" Grant, which "support[ed] the salary and fringe and any overtime for domestic violence advocates" and the supporting exhibits stated that it was a $45,811.53 grant that ran from October 1, 2015 through December 31, 2016.

At oral argument, the government clarified that it was relying on the Community-based Violence Prevention Grant to satisfy the benefits element for Count Two, "Theft Concerning Programs Receiving Federal Funds; Aiding and Abetting." The government stated that it was relying on the VAWA STOP Grant to satisfy the benefits element as to Count One, "Conspiracy to Commit Theft Concerning Programs Receiving Federal Funds."

The parties disagree as to whether Evans' argument is preserved.[6] We need not resolve this preservation issue because

---

[5] O'Brien also identified a third grant from that time period, called a "JAG Equipment Grant." At oral argument, the government conceded that it was not arguing that the JAG Equipment Grant satisfied § 666's benefits element.

[6] The government argues that Evans failed to renew his sufficiency of the evidence objection after presenting evidence in

- 17 -

the outcome is the same under either standard. The minimal evidence introduced at trial as to the structure and purpose of the two grants is insufficient to establish that those grant funds constituted "benefits" within the meaning of 18 U.S.C. § 666(b).

The government attempts to rely on this court's decision in Bravo-Fernández, 913 F.3d 244, to argue that, in this case, it presented minimally sufficient evidence of the two grants' structure, operation, and purpose to meet the required test. See Fischer, 529 U.S. at 681. We disagree.

In Bravo-Fernández, the defendants appealed their § 666 convictions following retrial.[7] See 913 F.3d at 246-47. The defendants argued that the government failed to introduce evidence at this second trial to satisfy § 666's benefits element. Id. at 247. This court agreed. In doing so, the court contrasted the record in the second trial with the record in the first trial. Id. at 247-48. At that first trial, "[a]n employee of the Puerto Rico Treasury Department [had] testified for the government that

_____

his defense at trial and so his objection should be reviewed for "clear and gross injustice," which is "a particularly exacting variant of plain error review." See United States v. Freitas, 904 F.3d 11, 23 (1st Cir. 2018) (emphasis omitted) (quoting United States v. Foley, 783 F.3d 7, 12 (1st Cir. 2015)). Evans contends that his objection was sufficiently preserved and should be reviewed de novo.

[7] This court had vacated the defendants' prior convictions for reasons unrelated to Evans' appeal. See Bravo-Fernández, 913 F.3d at 246.

'the Senate of Puerto Rico childcare program (known as the Food Program for the Care of Children and Adults) receive[d] funding from the Government of the United States.'" Id. at 248 (third alteration in original). "The witness [had] further averred, with the support of documentation also admitted into evidence, that the Puerto Rico Senate annually received around $20,000 in federal funds for the childcare program during the relevant period." Id.

But Bravo-Fernández does not support the government's argument. At most, its language in dicta might be read to suggest, but not hold, that at the first trial, the government might have met its burden. But we do not so read Bravo-Fernández, as the issue of the sufficiency of the evidence in the first trial was not before the court. Beyond that, in this case, as to the VAWA Stop Grant, the government's evidence was only that the grant "support[ed] the salary and fringe and any overtime for domestic violence advocates." This evidence provides no information about the program's "structure, operation, and purpose." Fischer, 529 U.S. at 681. The government's evidence does not even explain what the duties of the domestic violence advocates were, nor how the program "guards, aids, or promotes well-being," provides "financial help in times of sickness, old age, or unemployment," or constitutes "a cash payment or service provided for under an annuity, pension plan, or insurance policy." See id. at 677 (quoting Webster's Third New International Dictionary 204 (1971)).

- 19 -

Nor does the government's evidence explain why "domestic violence advocates" should be taken as identical to the direct provision of food assistance for children involved in Bravo-Fernández. See 913 F.3d at 248. The government did not meet its burden to show that the VAWA Stop Grant funds provided benefits beyond simply helping to cover the salaries of some employees, nor that that those employees did more than advocate on issues of domestic violence within BPD or the Massachusetts government.

The record contains even less information as to the Community-based Violence Prevention Grant, detailing only its name, amount, and duration. The prosecution failed to provide any evidence to explain the program's structure and purpose, and that is plainly insufficient to establish the benefits element of § 666. See Fischer, 529 U.S. at 681.

Because the government failed to present sufficient evidence to satisfy 18 U.S.C. § 666(b)'s benefits element as to both Count One and Count Two, we vacate Evans' convictions for conspiracy to commit federal benefits theft and federal benefits theft, respectively.[8]

---

[8] Since we have vacated both convictions involving the benefits element of § 666(b), we need not reach Evans' challenge to the district court's jury instructions as to that issue. Cf. United States v. Alioto, 469 F.2d 722, 723 n.1 (1st Cir. 1972) ("Since we dispose of this case on other grounds, we need not reach this question.").

**C. Other Challenges as to Which Evans Must Show Plain Error**

We review Evans' unpreserved objections for plain error. See United States v. Latorre-Cacho, 874 F.3d 299, 303 (1st Cir. 2017). Under this standard, Evans "faces the 'heavy burden of showing (1) that an error occurred; (2) that the error was clear or obvious; (3) that the error affected his substantial rights; and (4) that the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Prieto, 812 F.3d 6, 17 (1st Cir. 2016) (quoting United States v. Riccio, 529 F.3d 40, 46 (1st Cir. 2008)). Because we hold that Evans cannot show clear error as to the district court's instructions, we address only those prongs of this test that are dispositive of each claim.

**i. Challenges for Instructions Given**

**a. Good-Faith**

Evans argues that the district court's instruction that good faith does not "negate a defendant's intent to deceive or defraud others" improperly conveyed to the jury that it "could simultaneously find good faith and intent to defraud and, in that situation, it would be required to convict." Evans further argues that it was improper for the district court to state that a defendant's good faith "may negate an intent to commit the crime of conspiracy" because good faith is an absolute defense.

Evans cannot demonstrate that this was plain error. "[A] jury instruction 'must be evaluated not in isolation but in the context of the entire charge.'" United States v. Correia, 55 F.4th 12, 44 (1st Cir. 2022) (quoting United States v. Gonzalez, 570 F.3d 16, 21 (1st Cir. 2009)). Here, the district court instructed the jury on good faith in the context of Evans' conspiracy charges as follows:

> Since an essential element of the crime of conspiracy is the intent to commit the underlying crime, it follows that good faith on the part of Mr. Evans is a legitimate defense. If you find that Mr. Evans believed in good faith that he was acting properly, even if he were mistaken in that belief, and even if others were injured by his conduct, there would be no crime. As with other material aspects of an offense, Mr. Evans has no burden to establish his good faith. The burden is on the government to prove the lack of good faith beyond a reasonable doubt.
>
> Keep in mind that, while a defendant's honest belief that his actions were proper may negate an intent to commit the crime of conspiracy. However, a good faith belief that a potential victim will ultimately sustain no harm is not a defense. Nor will good faith negate a defendant's intent to deceive or defraud others. Your focus must be on whether the government has proved beyond a reasonable doubt that Mr. Evans, in fact, acted with a bad purpose to disobey or disregard the law.

As to Evans' wire fraud counts, the district court instructed that "[w]ith respect to the willfulness element, that I explained earlier, actions taken in good faith by a defendant constitute[] a legitimate defense." That language did not amount to an error

that was "clear or obvious." See Prieto, 812 F.3d at 17 (quoting Riccio, 529 F.3d at 46). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Latorre-Cacho, 874 F.3d at 302 (quoting Middleton v. McNeil, 541 U.S. 433, 437 (2004)). "The question is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process." Id. (quoting Middleton, 541 U.S. at 437). The district court repeatedly stated that "actions taken in good faith by a defendant constitute[] a legitimate defense." It is neither clear nor obvious that the district court's inconsistent instructions rose to the level of a due process violation.

As to Evans' argument that the district court's use of "may" improperly left open the possibility that acquittal would be optional had the jury found that Evans acted in good faith, there was no error. The full context of the district court's instruction makes it clear that the phrase "may negate" in no way suggested that acquittal was optional in such circumstances. It simply referred to the earlier portion of the district court's instruction, which stated that "[i]f you find that Mr. Evans believed in good faith that he was acting properly . . . there would be no crime."

### b. Advance Knowledge

Evans next argues that the district court erred by failing to adequately instruct the jury that convicting Evans for aiding and abetting the commission of his various charged crimes required proof that Evans had "advance knowledge" of "the circumstances constituting the charged offense." See Rosemond v. United States, 572 U.S. 65, 77-78 (2014). Evans contends that the district court's instruction lacked "any explanation of, or even reference to, [the] advance knowledge requirement." The district court's instruction was not so lacking.

The district court instructed the jury that to convict Evans of aiding and abetting, it must find that the government "prove[d] that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him or her." This instruction substantially comports with our advance knowledge precedent. This circuit "already had an advance knowledge requirement for aiding and abetting convictions prior to [the Supreme Court's establishment of such a requirement in] Rosemond[] and . . . has consistently used the 'consciously shared' formulation to describe our aiding and abetting law." United States v. Manso-Cepeda, 810 F.3d 846, 852 n.7 (1st Cir. 2016) (quoting United States v. García-Ortiz, 792 F.3d 184, 188 (1st Cir. 2015)).

Evans argues incorrectly that our decision in United States v. Fernández-Jorge, 894 F.3d 36 (1st Cir. 2018), compels the conclusion that the instruction was "clear or obvious" error. That is not correct. In Fernández-Jorge, this court considered whether a district court's instruction that the jury must find "that the charged defendants consciously shared the other person's knowledge of the crimes charged in the indictment, intended to help each other, and took part in the endeavor, seeking to make it succeed" adequately communicated the requirement that a would-be accomplice must have advance knowledge of each element of an offense. Id. at 52-53. This court observed that "whether this formulation r[an] afoul of Rosemond depend[ed] on whether 'seeking to make it succeed' applie[d] to all of the clauses that precede it, or only to its immediate predecessor: 'took part in the endeavor.'" Id. at 53. This was so because "[i]f it applie[d] to all of the preceding clauses, then we ha[d] no Rosemond problem because the instructions would require the jury to find that an alleged aider and abettor knew that the principal was to commit the crime of possessing a gun in a school zone when he leant his assistance with the intent to make the criminal endeavor succeed." Id. "But if the pronoun 'it' in 'seeking to make it succeed' refer[red] only to 'the endeavor,'" then "the instructions would allow the jury to find a defendant guilty of aiding and abetting" by "assisting the principal in bringing a gun to a particular

- 25 -

location, and only then, upon realizing that this location was in a school zone . . . 'consciously shar[ing]' the principal's knowledge of the crime" of possessing a gun in a school zone. <u>Id.</u> This court concluded that the second interpretation was the more likely of the two and that the instruction violated due process. <u>Id.</u> The instruction at issue in this case does not share the ambiguity we addressed in <u>Fernández-Jorge</u>.

### ii. Plain Error as to Evidentiary Objections

#### a. Opinion Testimony

Evans argues that the district court permitted witnesses to testify as to legal conclusions when they testified as to the meaning of the CBA and various BPD regulations. Evans contends that these are "purely legal questions" and are "exclusively the domain of the judge." <u>United States</u> v. <u>Mikutowicz</u>, 365 F.3d 65, 73 n.4 (1st Cir. 2004) (quoting <u>Nieves-Villanueva</u> v. <u>Soto-Rivera</u>, 133 F.3d 92, 99 (1st Cir. 1997)). The argument mischaracterizes the testimony. Most of that testimony is better characterized as being based on the witnesses' first-hand experiences working for the BPD. For example, Ellen Coppola, who worked for BPD's payroll department, testified that she was "familiar" with the term "extended shift/tour" and that she understood it to mean "[a]ny[] [overtime] that takes place immediately following your tour of duty" which was measured by "actual hours worked, but within 15 minutes." Coppola did not interpret the CBA or any BPD regulation

to form the basis for her testimony. Rather, she permissibly testified based on her personal experience. See United States v. George, 761 F.3d 42, 59 (1st Cir. 2014) ("Time and again we have stated that Rule 701 lets in 'testimony based on the lay expertise a witness personally acquires through experience, often on the job.'" (quoting United States v. Santiago, 560 F.3d 62, 66 (1st Cir. 2009))).

A different issue is the testimony from the former Superintendent Chief of Professional Standards for the BPD, Frank Mancini. Mancini was asked: "Does section 3 [of the CBA], which controls how overtime is measured or accrued, what time intervals, whether it's a 15-minute interval or a four-hour minimum, does that apply to voluntary overtime?" He responded "[y]es." Due to the awkwardness of the question, it is unclear whether his testimony was his observation based on his experience or an opinion as to a "purely legal question." See Mikutowicz, 365 F.3d at 73 n.4 (quoting Nieves-Villaneuva, 133 F.3d at 99). But even if it were the latter, it is insufficient to allow Evans to meet the "heavy burden" of plain error review. Prieto, 812 F.3d at 17 (quoting Riccio, 529 F.3d at 46). Given the ample other evidence that overtime was paid in fifteen-minute intervals except for court and recall time, it is highly unlikely that Mancini's testimony affected the outcome of the trial.

Indeed, Evans does argue that witnesses improperly testified as to the legal significance of Evans' actions. He alleges that witnesses were improperly "asked to characterize [the] defendant's conduct in 'terms that demand an understanding of the nature and scope of the criminal law.'" See United States v. Baskes, 649 F.2d 471, 478 (7th Cir. 1980). He focuses on testimony from Mancini as to the circumstances under which other instances of overtime theft were "handled as criminal investigations" and the "markers" that "indicated that they were criminal in nature" and testimony from former BPD officer Joseph Nee as to whether Nee felt he was committing "theft" or "[s]tealing" when he certified overtime hours he had not actually worked.

Evans relies on several out-of-circuit opinions to support the proposition that such testimony was improper. See Baskes, 649 F.2d at 478 ("When, as here, a witness is asked whether the conduct in issue was 'unlawful' or 'willful' or whether the defendants 'conspired,' terms that demand an understanding of the nature and scope of the criminal law, the trial court may properly conclude that any response would not be helpful to the trier of fact."); United States v. Wantuch, 525 F.3d 505, 514 (7th Cir. 2008) ("The question posed to [the witness,] to opine as to [the defendant]'s knowledge of whether his actions were 'legal,' demanded a conclusion as to the legality of [the defendant]'s

- 28 -

conduct, which is unhelpful to the jury under Rule 701."); United States v. Southers, 583 F.2d 1302, 1306 (5th Cir. 1978) ("'[I]ntent to injure and defraud is a phrase of particular legal construction where a defendant is charged with violations of 18 U.S.C. [§§] 656 and 1005; therefore, the bank officials were properly not permitted to give their opinions on the question of intent to injure and defraud.'").

Evans has failed to establish that the claimed errors were clear or obvious. The cases that Evans relies on dealt with instances in which witnesses testified as to the legality or legal significance of the defendant's conduct. But Evans concedes that in this case, "the witnesses did not specifically characterize Evans' conduct in criminal-law terms" and argues that "the jury could hardly escape the inference that the [witnesses'] descriptors applied to Evans's undisputed submission of overtime in four-hour blocks." Given the factual distinction Evans acknowledges and the heavy burden that Evans faces on plain error review, the inference he relies on is insufficient to establish that any error was clear or obvious.

### b. Evans' State of Mind

Evans argues that the district court committed plain error by permitting witnesses to speculate as to Evans' state of mind. Evans specifically objects to testimony from Mancini, former ECU officer Margaret Waggett, Nee, and FBI Agent Matthew Iannetti.

Mancini was shown an email that Evans sent to several of his subordinates when he was supervisor of BPD's Court Unit, which notified them that they had violated BPD "Rule 3265(B)," which prohibits officers from performing more than two overtime details at the same licensed premise in a month. Mancini was asked whether it appeared, "based on [Evans'] email," that Evans was "knowledgeable about BPD's rules and regulations . . . governing details." Mancini answered "[y]es."

Waggett was asked whether she attempted to hide the ECU's overtime practices from Evans after he took over as ECU supervisor. Waggett stated that she did not, and that she "assumed he knew" about the overtime practices, though she "never had a discussion with him about it."

Nee was asked whether he could have "gotten away with splitting . . . shifts and only working half the time if the supervisors didn't know it," to which he answered "[n]o, sir."

Iannetti was shown some of Evans' overtime slips on which Evans had received overtime with a four-hour minimum. On those slips, Evans listed a start and end time that equated to less than four hours worked. Iannetti was then asked "are these examples that if there's a four-hour minimum, he knows to put in less than four hours?" Iannetti answered "[c]orrect."

Evans has not shown that this testimony "affected his substantial rights" and "that the error also seriously impaired

the fairness, integrity, or public reputation of judicial proceedings." Prieto, 812 F.3d at 17 (quoting Riccio, 529 F.3d at 46). Evans devoted, at most, a single sentence of argument to the second and third prongs of the plain error analysis as it pertains to the testimony he alleges went to his state of mind. He makes no attempt to explain how the fairness of his trial could have been compromised given the substantial, unrelated evidence from which the jury could infer Evans' state of mind, such as Evans' decision to adopt ECU overtime practices after taking over as supervisor and the obvious falsity of his subordinates' claimed four-hour overtime shifts.

### c. Leading Questions

Evans argues that the district court plainly erred by allowing the government to "rel[y] extensively on leading questions in direct-examination of its own witnesses with no legitimate need to do so." Evans cannot show that, if the district court committed any error, that the error "was clear or obvious." Id. (quoting Riccio, 529 F.3d at 46). Evans concedes that district courts "have discretion to permit leading questions where necessary." See United States v. Hansen, 434 F.3d 92, 105 (1st Cir. 2006) ("There is, of course, a degree of tolerance for leading questions under certain circumstances. Because it is so case-specific, 'the trial judge is best situated to strike a practical and fair balance' and is afforded 'extensive discretion over the

phrasing of questions.'" (quoting United States v. McGovern, 499 F.2d 1140, 1142 (1st Cir. 1974))).

The district court noted that "both sides [were] using leading questions" and explained to the jury that such questions were "[s]ometimes . . . helpful in moving the testimony along." We have held that leading questions are appropriate to "lay a foundation for a line of questioning or to assist in developing coherent testimony." United States v. Mulinelli-Navas, 111 F.3d 983, 990 (1st Cir. 1997). Our sister circuits have held that leading questions are specifically permitted to "move direct examination along." See, e.g., United States v. Cephus, 684 F.3d 703, 707 (7th Cir. 2012); United States v. Mejia-Ramos, 798 F. App'x 749, 753 (4th Cir. 2019) (unpublished). Given the foregoing precedent, the district court's rationale for permitting leading questions was not a clear or obvious error.

### d. Other Testimony

Evans objects to testimony solicited by the government as to "the importance of officer truthfulness" or which characterized Evans' conduct as "'wrong' or 'bad'" and argues that this testimony "unfairly prejudice[d] the jury against Evans." These arguments are undeveloped, particularly for an issue on plain error review, and have been waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

### e. Cumulative Error

Evans argues that, even if none of the above errors are sufficient to independently call his conviction into question, a new trial should be ordered under the cumulative-error doctrine. Under the cumulative error doctrine, "'[i]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect' and thus add up to prejudice." United States v. Baptiste, 8 F.4th 30, 39 (1st Cir. 2021) (quoting United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993)). "Factors to be weighed in assessing the force of a claim of cumulative error include 'the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose . . .; and the strength of the government's case.'" United States v. Padilla-Galarza, 990 F.3d 60, 85 (1st Cir. 2021) (omission in original) (quoting Sepulveda, 15 F.3d at 1196).

Evans asks us to find that "the many unpreserved instances of improper opinion testimony and several unpreserved instructional errors . . . in combination with each other" satisfy the plain error standard. They do not so satisfy that standard. As we have explained, several of the alleged errors were not errors at all, while others may have been errors but were not obviously so. Evans does not explain how these errors, taken together, satisfy the third and fourth prongs of plain error review.

### III. Conclusion

For the foregoing reasons, we affirm Evans' convictions for conspiracy to commit wire fraud, and wire fraud. We vacate his convictions for conspiracy to commit federal programs theft and federal programs theft and remand for further proceedings consistent with this opinion.